## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROMMEL E. GRIFFIN, SR. | CIVIL ACTION NO. 2:08-cv-2000 |
| VERSUS | JUDGE CARL L. BARBIER |
| UNITED PARCEL SERVICE, INC. | MAGISTRATE ALMA L. CHASEZ |

*************************************************************************************************

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S
### RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

Plaintiff Rommel E. Griffin, Sr. brings his Renewed Motion for Partial Summary Judgment on his claim against Defendant United Parcel Service, Inc. under The Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.,* which requires that private employers provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). Plaintiff submits that there are no contested material issues of fact relevant to a determination of his claim pursuant to the ADA , and that he is entitled to judgment, as a matter of law.

### STATEMENT OF FACTS

**A.    Plaintiff was a long-term, high performing employee with diabetes.**

Rommel E. Griffin, Sr. was born on June 18, 1951.[1]  He was diagnosed with

---

[1]The facts stated in this paragraph are supported by Plaintiff's Affidavit, attached as Exhibit "A".

diabetes in approximately 1998. His mother has diabetes, as do several of his ten siblings. His father, now deceased, also had diabetes. For the first few years following diagnosis, Plaintiff was able to reasonably control his diabetes with oral medication. However, by 2004, he required daily injections of insulin, in addition to his oral medication. Plaintiff must be vigilant concerning when he eats, what he eats, and how much he eats. Stress adversely affects his blood sugar level. When he does not closely follow his required regimen, he begins to perspire and his vision becomes blurry. Despite his best efforts, as will be discussed more fully below, he has yet to achieve the blood sugar goals established by national associations, such as the American Diabetes Association, and adopted by his physicians.[2]

Plaintiff was employed by United Parcel Service ( "UPS") for a period of more than twenty-eight years. He began his employment as a driver in 1978, and only six months later was promoted to security supervisor. He continued to work as a supervisor in various positions until 1994, at which time he was promoted to a management grade position. From 1994 until the termination of his employment relationship with UPS in December, 2006, he worked in management positions in Louisiana in the UPS GulfSouth District. These position included the positions of center business manager, security manager, and hub manager.[3]

For a period of approximately two years, Plaintiff held the position known as "Twilight Hub Manager" of the UPS Hub operation on Morrison Road in New Orleans. He

_____

[2]Plaintiff's condition of diabetes is more specifically discussed at pp.16-22, *infra*.

[3]The information in this paragraph is documented on Plaintiff's "Employee History Profile," produced by UPS as D0002-D0007, attached hereto in globo as Exhibit "B".

worked from approximately 2:00 p.m. until the late evening hours between 10:00 p.m. and midnight.[4]  According to Roman Williams, the Human Resources Manager for the Gulf South District, a Hub Manager is "responsible for the hub operations which is like the spoke that would distribute packages from their hub throughout a certain distribution, throughout the region....[T]heir operation was mainly load trailers and send them to destinations so they could hit those centers to be able to deliver the packages locally."[5]  When the Twilight Hub Manager leaves for the evening, the Hub is managed by the Midnight Hub Manager, who works at the Hub throughout the night.[6]  According to Roman Williams, there is no difference between the twilight hub manager and midnight hub manager "other than the time that they work."[7]

Plaintiff performed well as a Twilight Hub Manager.  He had a staff of one full-time supervisor, approximately five part-time supervisors, and he managed a group of approximately one hundred part-time employees.[8]  He earned a performance evaluation of 93.2 for the year ending December 31, 2004.[9]  Eight months later, Hurricane Katrina struck.

---

[4]*See* Exhibit "A", paragraph 19.

[5]Deposition of Roman Williams, at p. 27, lines 15-25.  (Depositions have been introduced by joint submission of the parties.

[6]*Id.* at p. 29, lines 1-14.

[7]*Id.* at p. 29, lines 15-25; p. 30, lines 1-2.

[8]*See* Exhibit "A", paragraph 20.

[9]*See* Exhibit "B" (Griffin's Employee History Profile.)

**B.     The impact of Hurricane Katrina on Plaintiff's personal and work life led to his stress-related medical leave in March, 2006.**

The home in Gentilly where Plaintiff resided with his wife filled with more than six feet of water following Hurricane Katrina.  The church of which Plaintiff had been the pastor flooded as well.  The Morrison Road location of UPS also flooded.  Unable to immediately re-build their home (and in fact it is not yet currently habitable), the Griffins relocated to Geismar, Louisiana, approximately fourteen miles east of Baton Rouge.  For the several months following the re-opening of the Morrison Hub and up until Plaintiff was forced by his health to take disability leave in March, 2006, Plaintiff drove back and forth between Morrison Road in New Orleans and Geismar on almost a daily basis.[10]

In the months following Hurricane Katrina, Plaintiff suffered psychologically, economically, emotionally and physically.  Not only had he lost his home and his church, but he was required to drive long distances to and from work.  He was working under extraordinarily stressful circumstances caused by many factors, including the loss of experienced UPS employees, the lack of training available for new employees, and the increase in packages passing through the hub.  Further, it was not feasible to go get a meal somewhere in the devastation of New Orleans East, as he did pre-Katrina, or to have his wife bring in meals, as she did when they were residing in Gentilly pre-Katrina.  Even finding time to eat had become a problem.[11]

By approximately October, 2005, Plaintiff was experiencing troubling symptoms such as "numbness in [the] left half part of [his] head and [his] face, pain in [his] arms, and

---

[10]*See* Exhibit "A".

[11]*Id.*

-4-

it was a radiating type pain....[and] chest pains."[12]  These symptoms continued on and off

for several months, and ultimately led to Plaintiff taking a leave of absence in March, 2006,

during which time he received short-term disability benefits.

As stated by Plaintiff in his deposition, his "leave was related to the sensations that

[he] was having in [his] face..., in [his] arm, and in [his] chest."[13]  It appeared to his

physician, Dr. Fridge Cameron, that Plaintiff's symptoms were stress related, and Dr.

Cameron recommended that Plaintiff go through an outpatient program at the West

Jefferson Behavior Medicine Clinic.  This program involved group therapy of approximately

three hours a day, three times a week.  Plaintiff  participated in this program with good

results, from April, 2006 until his discharge on June 21, 2006.

During the course of the counseling program, Plaintiff learned about the relationship

between stress and controlling his diabetes:

> And in the process of investigating all of these things, one of the
> things that came out loud and clear was that stress was a factor, and
> one of the culprits against diabetes management is stress.  So when
> you look at the whole picture, the stress was something that kind of
> looked at the diabetes.  "You can't fix the diabetes without fixing the
> stress, so we'll bring you through this program and show you how to
> manage all of these things, stress, anxiety, and all of this stuff,"
> ultimately, it's going to have a benefit on diabetes.  "We can fix you
> here and we can get you through this, but over here, this is a lifetime
> event, and we need to make sure that you're in a position to manage
> it."[14]

During the course of the program, Plaintiff learned to "manage things now without

---

[12]Deposition of Rommel E. Griffin, Sr., at p. 145, lines 7-20.

[13]*Id.* at p. 180, lines 13-21.

[14]*Id.* at p. 180, lines 22-25; p. 181, line 1-14.

anxiety attacks, without recurring events of numbness in my face, my arm, my chest, and I attribute that all to the processes that was exposed to me in that Behavioral Medicine environment."[15]

**C.** **Plaintiff was not assigned to a position until two months after he was released to return to work, and then he was assigned to the position of Midnight Hub Manager.**

Plaintiff 's discharge date from the Behavioral Clinic was June 21, 2006.[16] He reported back to UPS the very next day, on June 22, 2006.[17] This was well before the termination of the six months period of short term disability benefits that he understood would be available to him if medically necessary. However, "[t]he only thing [he] wanted to do was get well so [he] could get back to work."[18]

On June 22, 2006, in accordance with UPS policy, Plaintiff reported to Geraldine Haydon, then the Occupational Health Manager of the Gulf South District of UPS. He provided her with two documents on that day. The first was a letter dated June 21, 2006, written and signed by Christine Meche, LCSW, the Adult Services Program Manager for the West Jefferson Behavioral Medicine Center, which stated as follows:

> It is the recommendation of the treatment team here at the Behavioral Medicine Center that Mr. Rommel Griffin be acclimated back in to [sic] work on a less than full-time schedule. It is recommended he be allowed to work four hours per day the first week, then six hours per day the second week.

---

[15]*Id.* at p. 182, lines 8-14.

[16]*Id.* at p. 182, lines 18-19.

[17]*Id.* at p. 183, lines 11-12.

[18]*Id.* at p. 183-184, lines 1-8.

He could then work full-time on his third week.[19]

The second document that Plaintiff provided to Ms. Haydon on June 22, 2006 was the "Plan notes" from Dr. Fridge Cameron, Plaintiff's long-time treating physician, who stated:

> Is ok to return to work on 6/22/06 if ok with Behavioral Medicine–**he would be best severed [sic] if he worked Day hrs**–as this would help him **control his diabetes**; he will need to continue the individual therapy sessions. [Emphasis supplied].[20]

However, as of June 22, 2006, Plaintiff was not asking for any accommodation, because it had not occurred to him that UPS would assign him to work a nighttime shift such as a Midnight Hub Manager position. He had hoped to be returned to his position of Twilight Hub Manager in New Orleans, but Roman Williams told him that the position had been filled.[21] Although Plaintiff was disappointed that he would not be returned to his Twilight Hub Manager position, he was reassured by Williams' representation to him that Williams was working on obtaining authorization for a Hub Training manager position for the Gulf South District, which position existed in other districts. According to Williams' deposition testimony, this position would have begun between 4:00 and 5:00 p.m., and ended at "two, one, two in the morning."[22] Plaintiff's recollection is that he was told that the new position's hours would be comparable to the hours of the Twilight Hub Manager position that he formerly held, although occasionally going as late as midnight or 1:00

---

[19]*See* Exhibit "C", attached.

[20]*See* Exhibit "D", attached.

[21]Deposition of Williams, at p. 86.

[22]*Id.* at p. 60, lines 4-9.

-7-

a.m.[23] Under either Williams' or Griffin's version, the position would have required Plaintiff to work later into the night than he had hoped for management of his diabetes, but nevertheless it was a position that Plaintiff believed he could handle, because he could still get to bed while it was nighttime.[24]

Unfortunately, the Gulf South District was unable to obtain corporate authorization for the Training Manager position. On August 22 or 23, after waiting more than eight weeks to be put back to work, Plaintiff was informed that he would be assigned to the position of Midnight Hub Manager on Morrison Road, a position that would require Plaintiff to work from 10:00 to 11:00 p.m., and through the night until 5:00 or 6:00 a.m., and sometimes until 7:00 a.m.[25]

### D. Plaintiff formally requested an accommodation to his diabetes.

Plaintiff did not believe that he could reasonably expect to successfully manage his diabetes and follow his strict regimen for meals, medication and insulin, when he would be eating meals and taking medicine and insulin at "normal" times on weekends, holidays and vacation, but at completely different times during the week when he was working all night and sleeping during the day.[26]

On August 24, 2006, Plaintiff wrote a letter to Roman Williams, with a copy to Geraldine ("Jerri") Haydon, in which he expressly requested an accommodation for his

---

[23]*See* Exhibit "A", at paragraph 31.

[24]*Id.,* at paragraphs 31-32.

[25]*Id.,* at paragraph 34.

[26]*Id.* at paragraph 35.

medical condition:

**RE: Accommodation Request**

**Dear Mr. Williams:**

**I was released from my doctors on June 22, 2006, approved to return to work with the following two stipulations:**

**Stipulation 1: That I be allowed to return to work on a graduated work schedule;**

**Stipulation 2: Scheduled work is adjusted to daytime hours as a plan to control medical condition.**

**Records supporting both stipulations were submitted to Jerri Hayden, Health Management Manager on June 22, 2006.**

**In view of this I am reiterating my request for a job accommodation that will be more conducive with the request made by medical providers.**

**Your reconsideration in this matter would be greatly appreciated.**

**Sincerely,**

**Rommel E. Griffin, Sr.**

**Cc: Jerri Hayden,
        Health Management Manager**[27]

Presumably in response to this request for an accommodation, Plaintiff was

instructed to submit to an examination by a UPS chosen physician, Dr. Yuruk Iyriboz.

Plaintiff did so, on August 28, 2006. Dr. Iyriboz stated in his report as follows:

**Can work as a supervisor/manager preferably during daytime since he is insulin dependent diabetic, w/reflux and hypertension.** [28]

---

[27]*See* Exhibit "E", attached.

[28]*See* Exhibit "F", attached.

Following this report, Plaintiff did not hear from UPS again until he received a letter dated September 20, 2006, signed by Sherry Anderson, District Workforce Planning Manager, informing Plaintiff that she had just learned of his request for a job-related accommodation.[29]   Sherry Anderson enclosed with the letter a Request for Medical Information to be completed by Plaintiff's physician, who was Dr. Fridge Cameron.[30]

Sherry Anderson attached to the Request for Medical Information what she described as a "list of the essential functions of the employee's current position with UPS." However, the "list of essential functions" did not place Dr. Fridge Cameron on notice that the specific position that Plaintiff had been offered was the Midnight Hub Manager position, and that the hours were consistently and not occasionally 10 to 11 p.m. throughout the night.  The list provided to Dr. Cameron was a generic description of possible duties and responsibilities, which referenced a broad spectrum of jobs described as "non-operations Specialists/Supervisors/Managers/unless otherwise listed."[31]   UPS did not inform Dr. Cameron that the specific position was titled "Midnight Hub Manager", which would have put him on notice of the nighttime nature of the position, and did not ask Dr. Cameron whether Plaintiff could reasonably be expected to manage his diabetes if he was permanently assigned to work the midnight sort.  Further, the Request for Medical Information did not specifically identify "eating" as a "major life activity".

Dr. Cameron was in the process of retiring at the time he was requested to fill out

---

[29]*See* Exhibit "G".

[30]*See* Exhibit "H".

[31]*See* Exhibit "I".

the form. Accordingly, during this same period of time, Plaintiff visited with a new physician, Dr. Tina Thethi, an Endocrinologist. On November 7, 2006, Dr. Thethi provided Plaintiff with a note written on her prescription pad, which stated that **"Patient would be in a better position to follow his therapeutic regimen for diabetes, if working morning hours."**[32]

On November 13, 2006, Plaintiff wrote a second letter to Geraldine Haydon.[33] In this letter, he noted the obvious– that the medical information form provided to him did not apply to his medical condition. He explained, once again, that he is "an insulin dependent diabetic" and that his condition, "if not managed effectively, can result in disabilities to include but not limited to, blindness, loss of limbs, kidney and heart disease, to name a few." He again asks for the accommodation to work days. Further, he attaches to the letter the three physician statements:  Dr. Fridge Cameron's 6/21/06 plan,  Dr. Iyriboz' report, and the note from Dr. Thethi.

### E.    UPS' decision-making process was flawed and superficial.

Thelma T. Lee, the Occupational Health Manager for the Southwest Region of UPS at the time relevant to this claim, was appointed by UPS as the corporate representative for the 30(b)(6) deposition in connection with the request for a "discussion of and production of all documents relevant to the decision-making process that led to the denial

---

[32]*See* Exhibit "J", attached. *See also* Dr. Thethi's deposition, in which she explains that "morning hours" means to her a position that begins in the morning and ends at 6 or 7 in the evening. P. 79, lines 18-21.

[33]*See* Exhibit "K".

of Mr. Griffin's request for an accommodation."[34] Lee had been employed by UPS for approximately four years.  Prior to October, 2006, she was a grade 14 supervisor.  Her promotion in October, 2006 was to a grade 16 manager position.  This was the very month that she was presented with Griffin's request for an accommodation.  Lee admitted that prior to October 2006, she had not been involved as a decision maker in an ADA request for accommodation at UPS.[35]

Lee admitted that she never met or spoke with Rommel Griffin.[36]  In fact, all that she did to reach a decision was to review the package provided to her by Geraldine Haydon.  The packet, which was introduced at her deposition, consisted of twelve pieces of paper.[37]  This package included the statements from Dr. Fridge Cameron, Dr. Yuruk Iryiboz, and Dr. Tina Thethi, as well as the Request for Medical Information filled out by Dr. Cameron, and Rommel Griffin's letter of November 13, 2006, pointing out the deficiencies in the Request for Medical Information and again referencing the three physician statements.[38]

When asked if she knew what the accommodation was that Mr. Griffin was requesting, Ms. Lee testified that her "understanding is the accommodation was that he

---

[34]Deposition of Thelma Lee, at p. 5, lines 14-22.

[35]*Id.* At p. 68, lines 4-10.

[36]*Id.* At p. 25, lines 18-24.

[37]*See* Exhibit "L", which was attached as Exhibit 8 to Lee's deposition.

[38]*See* Exhibit "J", previously attached.

was not able to work the night sort due to his diabetes."[39]  She confirmed in her testimony

that she had this understanding "as she sat and reviewed [the] packet and as [she] went

through the decision-making process...."[40]  However, neither she nor apparently anyone

else at UPS made any attempt to speak with any of the three physicians who had provided

opinions concerning Mr. Griffin, and made no attempt to explore the interplay between Dr.

Cameron's June opinion and the manner in which he responded to the questionnaire

provided to him.

Instead, UPS apparently relied solely on Dr. Cameron's completion of the

questionnaire to justify their denial.  This reliance was misplaced.  For example, although

Dr. Cameron said "yes" to the question of whether Plaintiff was able to "perform all of the

physical and mental functions of his/her position", there was no question that explored

whether Plaintiff was able to perform the temporal functions of the position of a Midnight

Hub Manager.  Further, when asked in No. 5 whether his impairments affect any major life

activity, the major life activity of "eating" is not provided as an example.  While an attorney

or an occupational health manager may be required to understand the legal definition of

what qualifies as a major life activity for the purposes of the ADA, such knowledge cannot

be required of or imputed to a physician.

Nevertheless, without any communications with any of the physicians, or any further

investigation, UPS rejected Plaintiff's request for an accommodation, by letter dated

---

[39]Deposition of Thelma Lee, at p. 48, lines 3-11.

[40]*Id.*, lines 12-16.

November 16, 2006.[41]  On December 1, 2006, Plaintiff wrote Sherry Anderson, expressing in detail his disappointment and recounting the history of events since his return on June 22, 2006.  He noted that he had made numerous calls to Ms. Anderson and left messages, but received no response.  He concluded by stating that he was "regretfully submitting to UPS' strategy to force [him] into retirement."[42]  UPS never called him back.

## DISCUSSION

The Americans With Disabilities Act ("ADA") requires covered entities, such as private employers, to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).

A "disability" is defined in § 12102(2) of the ADA as:

(A)  a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B)  a record of such an impairment; or

( C)  being regarded as having such an impairment.

Here, Plaintiff Rommel Griffin contends that his medical condition of diabetes is a "physical impairment" that "substantially limits" the "major life activities" of eating.[43]

---

[41]*See* Exhibit "M".

[42]  *See* Exhibit "N".

[43]The Americans with Disabilities Act Amendments Act of 2008, effective January 1, 2009, was enacted by Congress to make it explicit that it always intended for the ADA to provide much wider protection than that offered by the courts.  Although the ADAAA is not expressly stated to be retroactive, it is also not intended to change the law, but to make its original intent clear.  For example, in Sec. 2, "Findings and Purposes," Congress states that its expectation that

-14-

1.   **Diabetes is a "physical impairment".**

Diabetes is a "physical impairment" because "it affects the digestive, hemic and endocrine systems...." *Rohr v. Salt River Project Agricultural Improvement and Power District,* 555 F.3d 850, 858 (9th Cir. 2009).   The Rehabilitation Act Regulations issued by the Department of Health, Education and Welfare (HEW) define "physical impairment" to mean "any physiological disorder or condition...affecting one or more of the following systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; **and endocrine**." 45 CFR § 84.3(j)(2)(I) (2001) (emphasis supplied). These regulations are applicable to the ADA because 42 U.S.C. § 12201(a) provides that nothing in the ADA "shall be construed to apply a lesser standard than the standards applied under Title V of the Rehabilitation Act of 1973...or the regulations issued by Federal agencies pursuant to such title." *See Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 122 S. Ct. 681, 689 (2002) (discusses that the regulations interpreting the Rehabilitation Act are a source of guidance for interpreting the definition of physical impairment under the ADA).

---

"the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973" had not been fulfilled; further, Congress expressly states that both *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Manufacturing, Kentucky, Inc. v Williams*, 534 U.S. 184 (2002) "narrowed the broad scope of protected intended to be afforded by the ADA" and "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress. As a result, "lower courts have incorrectly found in individual cases that people with a wide range of substantially limiting impairments are not people with disabilities." 122 Stat 3553, Section 2. Thus, it is clear, without the necessity of applying the ADAAA, that the ADA may and should be interpreted in accordance with its original intent to find that diabetes is a disability that substantially limits the major life activity of eating.

## 2. **Diabetes substantially limits Plaintiff's major life activity of eating.**

"The Equal Employment Opportunity Commission regulations interpreting the ADA define "major life activity" by providing a non-exhaustive list that includes 'functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Lawson v. CSX Transportation, Inc.*, 245 F.3d 916, 923 (7th Cir. 2001), quoting 29 C.F.R. § 1630.2(l). "Clearly, the ability to eat is integral to one's daily existence, as much or more so than the activities listed in the implementing regulations." *Id.* at 923. Many courts have held that eating is a "major life activity" within the meaning of the ADA. *See, e.g., Lawson, supra; Fraser v.* Goodale, 342 F.3d 1032, 1038-40 (9th Cir. 2003); *Forest City Daly Hous., Inc. v. Town of North Hempstead,* 175 F.3d 144, 151 (2d Cir. 1999); *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 424 (8th Cir. 1999).[44]

The question here is whether Plaintiff's diabetes substantially limits his eating. Clearly, it does. In addition to his regimen of mediation, insulin, exercise, and checking his blood by finger prick several times daily,[45] Plaintiff **"is constantly vigilant and must be constantly vigilant in determining when to eat, what to eat (balancing proteins and carbohydrates), and how much to eat, and ...this requires, for him, consistent access to healthy food options and a consistent schedule which permits him to eat his meals and snacks within a particular range of time each day. That when he does**

---

[44]Section 3 of the ADAAA amends Sec. 3(2), "Major Life Activities," to *expressly* include "eating" as a major life activity. Further, Section (4), "Rules of Construction Regarding the Definition of Disability," provides that "the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—medication...."

[45]*See* Exhibit "A" (Plaintiff's Affidavit), at paragraphs 7-10.

**occasionally eat too large a meal, skip a meal, or eat too many carbohydrates or not enough protein, he begins to perspire and his skin becomes balmy, and frequently his vision becomes blurry."[46]**

Further, despite his best efforts, he has yet to attain the blood sugar test goals set by his physicians on the Ac1 test, and his blood sugar vary dramatically.  As just one example, on the night of January 3, 2010, following an ordinary day of diet, medicine and insulin, his blood sugar was 197.[47]  Plaintiff acknowledges in his Affidavit that when he feels stress, whether it is from employment, personal issues or this litigation, the stress affects his blood sugar.  The fact that he also suffers from hypertension and occasional reflux are additional challenges to the management of his diabetes.[48]

None of the information described above has been contradicted by any UPS witness.  UPS has not retained any expert to refute the testimony of Plaintiff, Dr. Cameron, Dr. Thethi, or Dr. Iryiboz.

The recent case of *Rohr v. Salt River Project Agricultural Improvement and Power District*, 555 F3d. 850 (9th Cir. 2009), provide a strikingly similar issue to the case before this Court. The plaintiff there, as here, was an type 2 insulin-dependent diabetic. The Court noted that although many type 2 diabetics can control their diabetes without insulin injections, Rohr, like Griffin herein, cannot.  Further, Rohr, like Griffin, in addition to daily injections of insulin, "had to test his blood sugar three to four times a day, could not eat

---

[46]*Id.* Paragraphs 11-12.

[47]*Id.* at paragraphs 14-15.

[48]*Id.* at paragraph 16-17.

large meals or skip meals and needed to snack on something every few hours."   The

Court of Appeal found that the lower court had oversimplified Rohr's condition:

> While it may seem easy to take a pill or shot of insulin, the reality of
> diabetes, a chronic and incurable disease, is not so simple. For people like
> Rohr, who must treat their diabetes with insulin, the failure to take insulin will
> result in severe problems and eventually death....Generally, food raises
> glucose levels while exercise and insulin reduce them. But other factors play
> a role, too (e.g., mental stress, illness and injury). To obtain the appropriate
> balance, Rohr must test his blood glucose levels through a finger stick test
> numerous times a day, and adjust insulin, food and activity level according
> to the results." *Id.* at p. 859.

The Court further noted that if daily insulin injections more or less stabilized blood sugar

levels such that limitation on diet would be minor, then the major life activity of eating might

not be substantially limited.  However:

> Rohr has alleged substantial limitations on his eating in spite of his medicine
> and insulin. He must snack regularly, plan his daily schedule around his diet,
> avoid skipping meals and eat immediately when he feels dizzy or light-
> headed....Straying from a diet for more than one or two meals is not a cause
> for medical concern for most people, and skipping a meal or eating a large
> one, does not expose them to the risk of fainting. **It is simply no answer to
> say that "if he strictly controls his diet" he is not substantially limited;
> for Rohr, the effort required to control his diet is itself substantially
> limiting.** *Id.* at p. 860. [emphasis supplied].

Dr. Cameron, Plaintiff's long-time physician, now retired, and Dr. Tina Thethi, who treated

Plaintiff in 2006 before she left private practice to become a full-time faculty member at

Tulane Medical School, both corroborate the challenges and risks of Plaintiff's condition.

UPS has deposed both of these physicians:

### Dr. R. Fridge Cameron.

Dr. R. Fridge Cameron managed Plaintiff's diabetes from 1998 through his

retirement in the Fall, 2006. Dr. Cameron's speciality was Internal Medicine. Dr. Cameron

explained that an individual with diabetes "should be on a regimen as strict as he can to be sure that he eats his three meals a day plus snacks if he needs them. He should try to be on the same time schedule, you know, eat breakfast the same time every morning, eat lunch the same time, have dinner the same time, try to go to bed roughly at the same time, keep everything in a routine and orderly fashion as much as they can. Along with this is the medications. Be very meticulous with taking your medications on time, at the same time. If they are on insulin, take your insulin at prescribed times. Whether it's a twice-a-day dosing or before meals or once a day, be meticulous in that." [49] Further, a diabetic "should have breakfast in the morning and lunch around noontime and dinner in the evening."[50]

Dr. Cameron testified that it had been his "experience that patients [with diabetes] who rotate around and change hours don't do as well as those that have fixed hours."[51]" Further, the fact that a diabetic patient has "fixed night hours" for work does not resolve the problem:

> If he continued working only at night and never had to go back and shift and go back and work, I would— it would be my opinion that at some point in time he's going to have days off and he's going to be at home and his family's going to be aware during the daytime and he's going to want to be awake during the daytime, and the days that he's off and not working, his schedule will be different. Then when he goes back and works nights again, he has to get back on his night schedule and his diabetic management would not be as good.[52]

---

[49]Deposition of Dr. Cameron, at p. 9, lines 21-25; p. 10, lines 1-15.

[50]*Id.* at p. 10, lines 11-16.

[51]*Id.* at p. 27, lines 23-25; p. 28, lines 3-6.

[52]*Id.* at p. 28, lines 13-25.

In response to UPS counsel's request as to whether Dr. Cameron has ever treated patients who worked nighttime schedules, Dr. Cameron stated that he had, and that these patients have "great difficulty.  They're much more difficult to treat."[53]

Finally, Dr. Cameron testified that he wants his diabetic patients to keep their blood sugars less than 140 and their A1c less than 7.  He noted that hypertension would increase the medical "risks of end organ damage."[54]  P. 68, lines 6-8 Hypertension would therefore "make it even more important that the glucose levels be maintained as closely as possible."[55]

**Dr. Tina Thethi**.

Dr. Thethi, an Endocrinologist who is now a full-time faculty member of Tulane Medical School, treated Plaintiff on two occasions in 2006, following Dr. Cameron's retirement.  Dr. Thethi explained that some of the complications that can arise from Type 2 diabetes are "eye problems, nerve problems, heart problems, damage to the GI tract, stomach problems, problem with erections, and problems when people give themselves shots when they're taking insulin...."[56]

Dr. Thethi noted that Lantus, a long-acting injectable insulin, was added to Plaintiff's oral medication regimen in early 2004.  When insulin is added, "it is added for

---

[53]*Id.* at p. 40.

[54]*Id.*

[55]*Id.* at p. 68, lines 9-12.

[56]Deposition of Dr. Thethi, at p. 24, lines 13-21.

improvement in control [of diabetes]."[57]  Dr. Thethi, in November 2006, increased Plaintiff's Lantus to 65 units in the morning  because "there was a time period over the past few weeks where the patient had blood sugars more than 200.  So to control his blood sugars."[58]  Dr. Thethi explained that blood sugar of 200 is high– "a normal sugar in a normal person is less than a hundred."[59]

In discussing Plaintiff's lab results from November, Dr. Thethi pointed out that Plaintiff's Plaintiff's "hemoglobin A1C should be less than seven, which is the goal.  He is at 7.9."  This result is "uncontrolled":

> "For a controlled diabetes, you should have a hemoglobin A1c of less than 7..  There is another set of guidelines by AACE, which is American Association of Clinical Endocrinology, which says you can have, can have, an A1C of 6.5 or less, which is even a more stringent control...So the goal that we try to get patients for and which has been set as guidelines and standards is less than seven."[60]

Dr. Thethi advised Plaintiff to check his sugars "fasting and two hours after meals." Further, she wrote the following note on a sheet of her prescription pad:: **"Patient would be in a better position to follow his therapeutic regimen for diabetes if working morning hours."[61]**

When questioned about the reason as to why he would be "in a better position" to

---

[57]*Id.* at p. 40, lines 11-16.

[58]*Id.*  at p. 43, lines 24-25; p. 44, lines 13-16.

[59]*Id.* at p. 44, line 25, p. 45, lines 3-5.

[60]*Id.* at p. 48.

[61]Exhibit "J".

follow that regimen, she stated that "[i]t's individual. I have people who do work nights, who do late in the evening, who have different hours and yet have a good control of their A1C, and then there are people who, because of the timings, are not able to remember to either take their medications or say that because they are working at night, they're not able to follow their regimen."[62]   **She also acknowledged that disturbed sleep patterns can cause blood sugars to elevate,[63] and that counter regulatory hormones that elevate blood glucose are released at different times when diabetics work at night. "The secretion– the pattern of secretion is also disturbed."[64]** P. 84, lines 7-16.

Dr. Thethi's described her note concerning morning hour work as a "recommendation."[65]

The uncontradicted testimony of Drs. Cameron and Thethi, and the uncontradicted affidavit of Plaintiff, unequivocally demonstrate that  Plaintiff's diabetes is a disability to him, and substantially limits the major life activity of eating, for him. The question should not be whether it is possible for a perfect person in a perfect world to manage his diabetes while working through the night.  The question should be whether the degree of difficulty to comply and be successful in managing his blood sugars while working a nighttime schedule is so high and the risk of failure so great as to require UPS, as a matter of law, to provide him with the requested accommodation.

---

[62]Deposition of Dr. Thethi, at p. 77-78. By morning hours, she meant 6 a.m. to 6 p.m., p. 79, lines 18-21.

[63]*Id.* at p. 83, lines 10-11.

[64]*Id.* at p. 84, lines 7-16.

[65]*Id.*  at p. 89, see discussion lines 2-21.

**Plaintiff was an "Otherwise Qualified Individual".**

The ADA requirement that an employee or prospective employee with a disability be "otherwise qualified" for the position is easily met here. Plaintiff was and is clearly qualified to perform as a manger for UPS under its own description of essential duties. In fact, he did perform as a manager for more than ten years, and prior to that as a supervisor. He was at all times able to perform the duties and responsibilities of a Twilight Hub Manager, which duties and responsibilities are identical to those of the Midnight Hub Manager, except for the hours worked. The only accommodation requested was that he be permitted to work daytime or even evening hours. All he asked for was to be able to go to sleep at night.

## Conclusion

Plaintiff, Rommel E. Griffin, Sr., submits that there is simply no material issue of disputed fact to preclude summary judgment in his favor on his ADA claim. UPS, a powerful and wealthy company, made no genuine effort and engaged in no true investigation to determine whether Plaintiff, a twenty-eight year management employee with a good record, required an accommodation to manage his serious health condition of diabetes. Mr. Griffin made several clear requests for what he needed and why, and he submitted three recommendations in support of his request. Had UPS been in good faith in evaluating Plaintiff's request for an accommodation, they would have– and legally should have– conducted an individualized evaluation of Plaintiff's diabetes and the regimen involved in managing this condition. This UPS did not do. The particular challenges of managing the disability of uncontrolled diabetes at fifty-five years old, with a history of

hypertension, stress issues, and reflux disease, were apparent to all three physicians with whom Plaintiff consulted.    They would also have been apparent to the UPS decisionmakers, had they conducted a meaningful and individualized investigation into the issue after having received Plaintiff's request.

All Plaintiff wanted was to go back to work, in a position that would allow him to succeed in the management of his demanding medical regimen.    UPS' failure to accommodate his request is a clear violation of the intent, spirit and word of the ADA.

Respectfully submitted,

/s/  Lisa Brener
Lisa Brener (#1809)
Lugenbuhl, Wheaton, Peck,
    Rankin & Hubbard
601 Poydras St., Suite 2775
New Orleans, LA 70130
Tel. (504) 568-1990
Fax (504) 310-9195
lbrener@lawla.com

**Attorney for Plaintiff,
Rommel E. Griffin, Sr.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of May, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Lisa Brener
Lisa Brener

## AFFIDAVIT

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

**BEFORE ME,** the undersigned Notary Public, duly commissioned and qualified in and for the aforesaid State and Parish, personally came and appeared **Rommel E. Griffin, Sr.,** who, after being duly sworn, did state as follows:

1.

That he is an African-American individual of the age of majority, 58 years old, born on June 18, 1951, and currently residing in Geismar, Louisiana.

2.

That all of the facts set forth herein are based upon Affiant's personal knowledge, information and belief.

3.

That he was employed by United Parcel Service ("UPS") for more than twenty-eight years, from 1978 until December, 2006, at which time he had no financial alternative other than to retire, for the reason that UPS failed and refused to return him to a position following a medical leave of absence.

4.

That he was diagnosed with Type 2 Diabetes in approximately 1998.

5.

That his mother and several of his ten siblings also have Type 2 Diabetes, and his father was diagnosed with diabetes in his seventies.

-1-



EXHIBIT

A

6.

That he was initially able to manage his diabetes with medication, diet and exercise, but by 2004, his diabetes was so uncontrolled that he was prescribed injectable insulin as part of his regimen, in addition to medication, diet and exercise.

7.

That in November, 2006, his insulin dosage was increased, as a result of high blood sugar tests of over 200 for several weeks.

8.

That he has continuously, to this date, followed a regimen for managing his diabetes that involves medication, insulin, exercise, checking his blood by finger prick several times daily, and the careful monitoring and management of his diet.

9.

That the injection of insulin and checking of his blood by finger prick requires sterile equipment and sanitary conditions.

10.

That he injects his insulin at bedtime, at approximately 10 or 11:00 p.m., for the reason that when he formerly injected his insulin in the morning, he did not have favorable results in managing his blood sugar.

11.

That he is constantly vigilant and must be constantly vigilant in determining when to eat, what to eat (balancing proteins and carbohydrates), and how much to eat, and that this requires, for him, consistent access to healthy food options and a consistent schedule which permits him to eat his meals and snacks within a particular range of time each day.

-2-

12.

That when he does occasionally eat too large a meal, skip a meal, or eat too many carbohydrates or not enough protein, he begins to perspire and his skin becomes balmy, and frequently his vision becomes blurry.

13.

That he has lost in excess of twenty pounds since November, 2006, and uses his best efforts to manage his diet and to exercise.

14.

That despite his best efforts, he has not attained the blood sugar test goals set by his physicians. For example, on the Ac1 test he has never had a reading of 7; his testing ranges from high 7s to high 9s.

15.

Further, that although his morning fasting test sometimes is as low as 105, it frequently is as high as 150 or higher. His blood test last night, January 3, 2010, was 197, although he had followed his regimen of diet, medicine, and insulin.

16.

That when he feels stress, such as from employment, personal issues, or this litigation, he sees a correlation with his blood sugar readings, making it even more important to him as a personal goal to carefully manage his regimen, including his diet and medicine.

17.

That he suffers from hypertension and occasional reflux in addition to his diabetes.

-3-

18.

That he held the position of Twilight Hub Manager of the Morrison Road UPS facility from Spring, 2004, until he was replaced during the time that he was out on a medical leave of absence and short term disability in Spring, 2006.

19.

That prior to Hurricane Katrina, as Twilight Hub Manager he worked from approximately 2:00 in the afternoon until, typically, 10-11:00 at night, and occasionally as late as midnight.

20.

That prior to Hurricane Katrina, he had a staff of one full-time supervisor, approximately five part-time supervisors, and he managed a group of approximately one hundred part-time employees. His performance evaluation for the year ending December 31, 2004, was 93.2.

21.

That during the time he worked at the Morrison Road facility prior to Hurricane Katrina, as the Twilight Hub Manager, his wife, with whom he lived in Gentilly, frequently brought him an evening meal, and there were restaurants and stores open in New Orleans East where he could purchase food.

22.

That the home in which he lived with his wife in Gentilly, Louisiana, had more than six feet of flood water during Hurricane Katrina.

23.

That he was ordained as a minister in 1999, and became the pastor of a church in

-4-

2002; and the church was also flooded during Hurricane Katrina, and his congregation was scattered by evacuation and destruction of homes and business.

24.

That he returned to his employment from his evacuation in Houston shortly after Hurricane Katrina, and worked in Jackson, Ms and Port Allen, LA while the Morrison Road location, which had also flooded, was being restored.

25.

That he returned to his work as Twilight Hub Manager on Morrison Road when the facility re-opened.

26.

That upon returning to work on Morrison Road in the Fall, 2005, his wife, who was living in the Baton Rouge area, could not bring him meals, and there were no open stores or restaurants.

27.

Further, in the months following Hurricane Katrina, there was little time to eat at work, because the facility was understaffed, had lost long-time experienced employees, and was staffed with inexperienced and often incompetent new workers.

28.

By September into October, 2005, Affiant had begun experiencing numbness in his head and face, and pain in his arms and chest. After several visits with physicians and to the emergency room at the hospital, Affiant took a leave of absence in March, 2006, and applied for and received short-term disability benefits. Affiant's physician and Affiant

believed that the numbness and pain were stress-related.

29.

That he attended a counseling program at West Jefferson Behavior Medicine Clinic, which involved group therapy of approximately three hours a day, three times a week. He attended the program from April 4, 2006 until June 21, 2006, at which time he was discharged.

30.

That he reported back to UPS on June 22, 2006, and was looking forward to be assigned to work. However, he was told that the Twilight Hub Manager position was filled, and that another position for which he believed he was well-suited, Employee Relations Manager, was going to be filled with another individual.

31.

That Roman Williams, the GulfSouth District Human Resources Manager, told him that he was working on obtaining a new position for the district, of Hub Training Manager, which would be Affiant's position. That position had no operational responsibilities, solely training responsibilities, and the hours, as he understood it, were comparable to the position of Twilight Hub Manager, although sometimes going into the early hours of the midnight hub operation, i.e. midnight or 1:00 a.m.

32.

That although he felt that he would be in a better position to manage his diabetes if he could be home by evening, he was willing to accept either his Twilight Hub Manager position or the new Hub Training Manager position, for the reason that in either position, with careful planning, he could still eat his meals, take his medicine, inject his insulin, and

check his blood at the approximate same time each of the seven days of a week, including both working and non-working days. The routine would not be significantly disrupted.

33.

That he checked in, by telephone and in person, on many occasions during July and August, wanting to be put back to work.

34.

That on or about August 21-22, 2006, he was told that the Hub Training Manager position had not been approved, and that he was to be assigned to the Midnight Hub Manager position, that would require that he work from 10 or 11 at night until 5:00 or 6:00 a.m., or on occasion as late as 7:00 a.m. Affiant, in past positions, such as with the Security department, had personally observed Midnight Managers still at work at 7:00 in the morning.

35.

That under such a schedule, he did not believe that he could reasonably expect to be successful in the management of his diabetes, including his meals, medication and insulin, when he would be eating meals and taking his medicine at "normal" times on weekends, holidays and vacations, but at other times during the week when he was working all night and sleeping all day.

36.

That he requested the accommodation of not being required to work at nights as required by the Midnight Hub Manager position; he made this request in writing on August 24, 2006, and again by letter dated November 13, 2006, and provided three recommendations from physicians concerning this request, including the recommendation

-7-

of the UPS doctor to whom he was sent, Dr. lyriboz.

37.

That through the course of his more than twenty-eight years of employment with UPS, Affiant asserts that it was not uncommon when managers went out on leaves of absence for medical or other reasons, that their positions were maintained for them. Sometimes substitutes were used for a period of time and sometimes experienced supervisors filled in during the absence. In fact, on two occasions, Affiant himself temporarily assumed the responsibilities of managers out on medical leaves of absence.

38.

At the time that Affiant was transferred to the position of Twilight Hub Manager on Morrison Road in Spring, 2004, the position had been vacant for a substantial period of time, and two supervisors had been left in charge, while awaiting a new manager.

39.

One of these supervisors, Alex Greene, was experienced and knowledgeable, and was of great assistance to Affiant in his transition to his new position. Greene was still employed as a supervisor beneath Affiant when Affiant went out on disability leave in March, 2006, and Greene could have easily assumed all of the responsibilities and duties of the Twilight Hub Manager position until Affiant's return.

40.

Affiant further asserts that over the course of his more than twenty-eight years of employment with UPS, the company has frequently moved managers from positions to positions, as demonstrated by his own employee history profile.

41.

That the individual who was given the position of Twilight Hub Manager could have been moved into the Midnight Hub Manager position, which would have permitted Affiant to return to his position.  Said individual, Darryl Cemo, had not worked as a manager before, having been a supervisor until his promotion into this position, and had far fewer years with UPS.  Further, he had no hub experience.

42.

That it has also been Affiant's experience that when individuals return from disability leave, they are immediately returned to work in some capacity until an appropriate permanent assignment can be made for them.

43.

That at the time Affiant requested the accommodation that he not be required to work at night, he had serious concerns that he would not be able to adequately and consistently follow the medical and dietary regimen required to manage his diabetes if he could not sleep at night for each of the seven nights of the week, and eat his meals and take his medicine and insulin and check his blood at the approximate same times of each day.

New Orleans, Louisiana, this *4th* day of _January_____, 2010.

Rommel E. Griffin, Sr.

Notary Public
Lisa Brener (1809)

11/06/2009 15:33 FAX   5045689130        UPS DUNBAR LLP                    ☑ 011/089

**EXHIBIT B**

tabbies®

# United Parcel Service
## Employee History Profile

| Employee Name: Griffin Sr., Rommel | | | | Employee ID Number: 0528338 |
|---|---|---|---|---|

| Employment Date: 03/11/1978 | Race: B | Gender: M | Grade: 016 |
|---|---|---|---|

****To change personal information go to UPSers.com or your local HR office. To make job related changes, complete the appropriate GEMS form.

### GEMS Job History (Starts from Mar 1999)

| Region | District | Job Change Reason | Start Date | Job Class | Job Group Description | Type Employment |
|---|---|---|---|---|---|---|
| 06 - Southwest | 71 - Gulf South | TER/RXT | 12/01/2006 | HUB MANAGER | MID MANAGER | OPERATIONS MANAGER |
| 06 - Southwest | 71 - Gulf South | LOA/PTD | 03/21/2006 | HUB MANAGER | MID MANAGER | NON-OPERATIONS MANAGER |
| 06 - Southwest | 71 - Gulf South | RET/REL | 02/00/2005 | HUB MANAGER | MID MANAGER | NON-OPERATIONS MANAGER |
| 06 - Southwest | 71 - Gulf South | LOA/FML | 12/16/2005 | HUB MANAGER | MID MANAGER | NON-OPERATIONS MANAGER |
| 06 - Southwest | 71 - Gulf South | REL/RE1 | 12/15/2005 | HUB MANAGER | MID MANAGER | FT SUPV NON-OPERATIONS |
| 06 - Southwest | 71 - Gulf South | LOA/PTD | 12/14/2005 | HUB MANAGER | MID MANAGER | FT SUPV NON-OPERATIONS |
| 06 - Southwest | 71 - Gulf South | DTA/CHG | 08/01/2005 | HUB MANAGER | MID MANAGER | |
| 06 - Southwest | 71 - Gulf South | DTA/CHG | 05/22/2004 | HUB MANAGER | MID MANAGER | |
| 06 - Southwest | 71 - Gulf South | JRC/JRC | 04/19/2004 | HUB MANAGER | MID MANAGER | |
| 06 - Southwest | 71 - Gulf South | JRC/JRC | 08/31/2003 | SECURITY MGR | MID MANAGER | |
| 06 - Southwest | 71 - Gulf South | DTA/CHG | 04/12/2000 | SECURITY MGR | MID MANAGER | |
| 06 - Southwest | 71 - Gulf South | XFR/RCR | 02/31/2000 | SECURITY MGR | MID MANAGER | |
| 06 - Southwest | 71 - Gulf South | JRC/JRC | 10/02/2000 | SECURITY MGR | MID MANAGER | |
| 11 - South Central | 71 - Louisiana | | | | MID MANAGER | |

### Job History (Prior to Mar 1999)

| Region | District | Job Change Reason | Start Date | Job Class |
|---|---|---|---|---|
| 11 - South Central | 71 - Louisiana | Lateral | 31/24/1999 | BUSINESS MGR |
| 11 - South Central | 71 - Louisiana | Lateral | 12/01/1997 | SP ASN TO DIST |
| 11 - South Central | 71 - Louisiana | Promotion | 09/03/1994 | DI MGR |
| 11 - South Central | 71 - Louisiana | Lateral | 02/05/1994 | SECURITY SUPERVISOR |
| 11 - South Central | 71 - Louisiana | Lateral | 01/02/1955 | SECURITY SUPERVISOR |

Printed on: 08/30/2007

10:30:08 EmpPrg

D0002

United Parcel Service
Employee History Profile

| Employee Name: Griffin Sr., Ronuttel | | | | | Employee ID Number: 0528338 |
|---|---|---|---|---|---|
| 11 - South Central | 71 - Louisiana | Lateral | 09/01/1984 | DI SUPV | FT SUPV NON-OPERATIONS |
| 11 - South Central | 71 - Louisiana | Lateral | 03/01/1981 | SECURITY SUPERVISOR | FT SUPV NON-OPERATIONS |
| 11 - South Central | 71 - Louisiana | Lateral | 03/01/1979 | PKG OPS SUPV | FT SUPV OPERATIONS |
| 11 - South Central | 71 - Louisiana | Lateral | 10/01/1978 | NON-OPS AS SUPV | FT SUPV NON-OPERATIONS |
| 11 - South Central | 71 - Louisiana | Promotion | 05/01/1978 | SECURITY SUPERVISOR | FT SUPV NON-OPERATIONS |
| 11 - South Central | 71 - Louisiana | Start | 01/01/1978 | PACKAGE DRIVER | FT UNION HOURLY |

### Education

| Graduation Date | School | Major | Other | Education Level |
|---|---|---|---|---|
| 05/01/1972 | Univ New Orleans | | Other | Coll Fresh |

### Languages

| Language | Translator | Speak | Read | Write |
|---|---|---|---|---|
| | | | | |

### Performance Appraisals

| Type | Start Date | End Date | Rating |
|---|---|---|---|
| QPR | 1/1/2005 | 12/31/2005 | 77.1 |
| QPR | 1/1/2005 | 12/31/2005 | 82.1 |
| QPR | 1/1/2004 | 12/31/2004 | 93.2 |
| QPR | 7/1/2003 | 12/31/2003 | 75.4 |
| QPR | 7/1/2002 | 12/31/2002 | 85.4 |
| QPR | 1/1/2002 | 6/30/2002 | 92.8 |
| QPR | 7/1/2001 | 12/31/2001 | 69.0 |
| QPR | 7/1/2000 | 12/31/2000 | 95.9 |
| QPR | 1/1/2000 | 6/30/2000 | 95.5 |
| QPR | 1/1/1999 | 12/31/1999 | 79.1 |
| QPR | 1/1/1998 | 12/31/1998 | 80.5 |
| QPR | 7/1/1997 | 12/31/1997 | 4.0 |
| QPR | 1/21/1997 | 6/1/1997 | 53.1 |
| QPR | 7/1/1996 | 12/31/1996 | 4.1 |
| QPR | 1/1/1996 | 6/30/1996 | 4.5 |

### UPS Training

Printed on: 05/05/2007

**D0003**

11/06/2009 15:34 FAX  5045889130          PHELPS DUNBAR LLP                    013/069

## United Parcel Service
### Employee History Profile

**Employee ID Number: 0528338**

**Employee Name: Griffin Sr, Rommel**

| Date | Description | Instructor |
|------|-------------|------------|
| 02/27/2006 | ONE VISION MANAGEMENT TRAINING | No |
| 02/15/2006 | ADOPT CERTIFICATION | No |
| 08/04/2005 | CO-CHAIRED H&S COMM WKSHP | No |
| 06/30/2005 | YARD CONTROL NON-CERTIFIED EMP | No |
| 06/15/2005 | EMPL SAFETY TRNG (ESTA) | No |
| 05/07/2005 | YARD CONTROL CERTIFIED EMP | No |
| 04/26/2005 | FOCUS ON COMPLIANCE 2005 | No |
| 04/21/2005 | ADOPT CERTIFICATION | No |
| 03/09/2005 | HUB/LS METHOD & AREAS WKSHP | No |
| 03/03/2005 | ONE VISION MANAGEMENT TRAINING | No |
| 03/24/2005 | PERSONAL PROTECTIVE EQUIP | No |
| 02/24/2005 | SAFE WORK HABITS | No |
| 02/24/2005 | CONVEYOR SECURING | No |
| 02/24/2005 | HAZ MAT TRNG - OPS 1 HR VIDEO | No |
| 02/23/2005 | INJURED EMPLY PROCEDURE | No |
| 03/22/2005 | IRREG CART OPERATOR TRNG | No |
| 06/04/2005 | HUB MANAGER WORKSHOP (MW) | No |
| 01/14/2005 | OUR COMPANY VIDEO | No |
| 12/10/2004 | INSIDER TRADING TRAINING | No |
| 12/10/2004 | ANTITRUST COMPLIANCE TRAINING | No |
| 12/10/2004 | ANTI-CORRUPTION TRAINING | No |
| 08/24/2004 | WRKPL VIOLENCE PREVNT PROGRAM | No |
| 08/23/2004 | ADOPT CERTIFICATION | No |
| 06/02/2004 | INFORMATION USE AND SECURITY | No |
| 05/28/2004 | WKP VIOL PREVEN POL&PROC PGM | No |
| 05/18/2004 | PERSONAL PROTECTIVE EQUIP | No |
| 05/11/2004 | HAZ MAT TRNG - OPS 1 HR VIDEO | No |
| 05/11/2004 | CONVEYOR SECURING | No |
| 05/04/2004 | ONE VISION MANAGEMENT TRAINING | No |

**D0004**

11/06/2009 15:34 FAX  5045689130          PHELPS DUNBAR LLP                    ☒014/069

United Parcel Service
Employee History Profile

Employee ID Number: 0528338

Employee Name: Griffin Sr., Rommel

| Date | Description | | |
|---|---|---|---|
| 04/22/2004 | HAZ MAT TRNG - OPS 1 HR VIDEO | | No |
| 02/03/2003 | HAZ MAT TRNG - OPS 1 HR VIDEO | | No |
| 02/03/2003 | CONVEYOR SECURING | | No |
| 01/03/2003 | OUR COMPANY VIDEO | | No |
| 01/07/2003 | FOCUS ON COMPLIANCE 2003 | | No |
| 11/21/2002 | ERI FOLLOW SESSION | | No |
| 04/01/2002 | CODE OF BUSINESS CONDUCT | | No |
| 04/01/2002 | CONTRACT RATIFICATION REFRESH | | No |
| 04/01/2002 | LEGACY/PARTNERING PRESENTATION | | No |
| 02/01/2002 | OUR COMPANY VIDEO | | No |
| 09/01/2001 | LRNG MAP 5 - INVSTG TO GROW | | No |
| 10/07/2000 | ERI FOLLUP SESSION | | No |
| 08/04/2000 | LRNG MAP 4 - ENBLG GLOBAL COMM | | No |
| 05/01/1999 | CBT-ND-FUEL DROP | | No |
| 05/01/1999 | CBT-ND-DMP CES QG | | No |
| 05/01/1999 | CBT-ND-FULL DMP | | No |
| 05/01/1999 | QIP CERTIFICATION | | No |
| 05/01/1999 | CBT-ND-WATER QUALITY | | No |
| 05/01/1999 | CBMAND-ENVIRON ROLES & RESBLTY | | No |
| 04/01/1999 | SCCP RECURRENT TRAINING | | No |
| 03/01/1999 | CBT-ND-AUTOMOTIVE ENV | | No |
| 05/01/1999 | CBT-ND-FUEL INSPECT & REC | | No |
| 01/01/1999 | PROF CONDUCT POLICY REVIEW | | No |
| 04/01/1998 | EDR Employee Trng (Intro) | | No |
| 02/01/1998 | GROUP COACHES DEVELOPMENT | | No |
| 02/01/1998 | GROUP DEVELOPMENT WORKSHOP | | No |
| 04/01/1997 | WRKPL VIOLENCE PREVNT PROGRAM | | No |
| 04/01/1997 | BUILD EMP REL THR COMM-IN | | No |
| 04/01/1997 | LABOR REL MANAGERS WORKSHOP | | No |
| 12/01/1996 | BUS CONDUCT COMPLI PROGRM | | No |

4

Printed on: 06/05/2007

D0005

11/06/2009 15:34 FAX  5045889130          PHELPS DUNBAR LLP                    ☑015/069

United Parcel Service
Employee History Profile

Employee Name: Griffin Sr, Rommel                                          Employee ID Number: 0528338

| | | |
|---|---|---|
| 02/01/1996 | QUALITY IMPROVEMENT PROCESS | No |
| 02/01/1996 | TRUST AND TEAMWORK | No |
| 11/01/1995 | QUALITY AT WORK | No |
| 05/01/1995 | SAFE WORK HABITS | No |
| 02/01/1995 | REGION CAMPAIGN TEAM WKSHP | No |
| 10/01/1994 | IMPART EMPL & PROMO TRNG | No |
| 11/01/1992 | ADA PROCEDURES OVERVIEW | No |
| 11/01/1992 | PROFESSIONAL RELATIONSHIPS | No |
| 03/01/1992 | DEFENSIVE DRVG SCH 20 HR | No |
| 02/01/1992 | LINKING DIVERSITY | No |
| 02/01/1992 | COURTESY PLUS | No |
| 06/01/1990 | INJURED EMPLY PROCEDURE | No |
| 11/30/1988 | EMPLOYEE ASSISTANCE PROCED OVE | No |
| 05/01/1988 | LABCR REL WKSHP - STAFF MGMT | No |
| 06/01/1985 | PEOPLE WORKSHOP | No |
| 05/01/1985 | DEL INFO SUPERVISORY WKSHP | No |
| 02/01/1984 | 34C METHODS CERTIFICATON | No |
| 02/01/1984 | LOSS PREVENTION SEMINAR | No |
| 03/01/1981 | EMPLOYEE RELATIONS WORKSHOP | No |
| 09/01/1980 | SUPV BASIC TRNG SCHOOL (SBTS) | No |
| 01/01/1979 | SAFE WORK METHODS | No |
| 09/01/1978 | NEW MANAGEMENT ORIENTATION | No |

| Annual Employee Discussions | | Career/Personal Development Discussion |
|---|---|---|
| Type | Date | Date |
| Salary Discussion | 3/1/2006 | |
| TLA | 5/5/2005 | 6/3/2005 |
| Salary Discussion | 3/15/2005 | 10/1/2004 |
| Salary Discussion | 1/1/2004 | 10/4/2003 |
| TLA | 2/27/2001 | 3/1/2002 |
| Salary Discussion | 2/27/2001 | |

Printed on: 06/25/2007

1.221006.1.HrEmpProt

**D0006**

United Parcel Service
Employee History Profile

Employee Name: Griffin Sr. Rommel

Employee ID Number: 0528338

| TLA | 5/1/2002 |
| Salary Discussion | 3/1/2002 |

Comments

Human Resources Manager Signature

Date

Printed on: 06/03/2003

D0007

03-14-07   09:46am   From-EEOC ENF                    504-589-6033      T-086   P.010/010   F-698



# West Jefferson Medical Center

*Behavioral Medicine Center - Bellemeade*

229 Bellemeade Boulevard
Gretna, Louisiana 70056

(504) 391-2440

6/21/06

To Whom It May Concern:

It is the recommendation of the treatment team here at the Behavioral Medicine Center that Mr. Rommel Griffin be acclimated back in to work on a less than full-time schedule. It is recommended he be allowed to work four hours per day the first week, then six hours per day the second week. He could then work full-time on his third week.

If you have any questions, please feel free to contact me at (504) 391-2440.

Thank you,

Christine Meche, LCSW
Adult Services Program Manager



EXHIBIT

C

P-14

## Heart:
The heart reveals a regular rate and rhythm with a normal S1 and S2. There are no murmurs or gallops appreciated.

## Abdomen:
The abdomen is soft and non-tender. There is no guarding or rebound tenderness present. The bowel sounds are present. There is no hepatosplenomegaly, masses, or evidence of ascites. There is no costovertebral angle tenderness.

## Musculoskeletal:
There are no acutely inflamed or swollen joints. There are no obvious physical deformities. There is no edema present.

## ASSESSMENT:

| Diagnosis | Icd9 Code | Description |
|-----------|-----------|-------------|
| 25000 | 250.00 | Niddm Adult Controlled |
| 4011 | 401.1 | Benign Hypertension |
| 6929 | 692.9 | Dermatitis Nos |

Patient:   ROMMEL E GRIFFIN          Date:      06/20/2006

## PLAN:
### Medication:

| Date Last Renewed | Brand Name | Dose | Rx Quanity | Rx Refills | Sig Desc |
|-------------------|-----------|------|-----------|-----------|----------|
| 02/04/2002 | Zocor | 20mg | 30 | 3 | Take one tablet every night at bedtime. |
| 07/26/2005 | Monopril | 40mg | 30 | 3 | 1 q am |
| 02/16/2006 | Aciphex | 20mg | 30 | 3 | Take one tablet daily. |
| 12/29/2005 | Pv Tussin | 8oz | 1 | | Take one to two teaspoon every four hours as needed for cough. |
| 11/03/2005 | Starlix | 120 Mg | 100 | 3 | Take one tablet before meals three times per day. |
| 06/20/2006 | Lantus | 100 U/ml | 100 | 2 | take 58 units SQ q am. |
| 07/26/2005 | Metformin Hcl | 1000mg | 180 | 3 | 1 bid |
| | Insulin Syringe | | | 100 | 3          use as directed |
| 02/16/2006 | Penlac | 8% | 1 | 3 | Apply thin layer once daily |
| | Lotrisone | 1-0.05% | 15G | 3 | apply tid |
| 11/21/2001 | Aspirin | 325mg | 0 | 0 | Take one tablet daily. |

R F. Cameron has reviewed the medication.
The following lab(s) were ordered:
**Chemistry**
Glucose Quant. Blood
Urine Microalbum
**Lab Tech Comments:** quest-la
**Hematology**
Hemoglobin A1C



Plan notes: is ok to return to work on 6/22/06 if ok with Behavioral Medicine---he would be best severed if he worked Day hrs--as this would help him control his diabetes; he will need to continue the individual therapy sessions
Follow up: 3month(s)
Follow up: additional problems

ROMMEL E GRIFFIN                    3                    92446-15   P-34

'03-14-07   09:46am   From-EEOC ENF                    504-589-6033        T-086   P.006/010   F-699

August 24, 2006


Mr. Roman Williams
District Human Resource Manager
151 Brookhollow Esp.
Harahan, LA  70123

                    RE:  Accommodation Request

Dear Mr. Williams:

I was released from my doctors on June 22, 2006, approved to return to work
with the following two stipulations:

> Stipulation 1:  That I be allowed to return to work on
> a graduated work schedule;

> Stipulation 2:  Scheduled work is adjusted to daytime
> hours as a plan to control medical condition.

Records supporting both stipulations were  submitted to Jerri Hayden, Health
Management Manager on June 22, 2006.

In view of this I am reiterating my request for a job accommodation that will be
more conducive with the request made by medical providers.

Your reconsideration in this matter would be greatly appreciated.

Sincerely,



Rommel E Griffin, Sr.

cc: Jerri Hayden,
        Health Management Manager



EXHIBIT
E

P-12

# UNITED PARCEL SERVICE
## Worker's Compensation WORK STATUS REPORT



TO THE EMPLOYEE: Any employee with a work-related injury is responsible for providing Health and Safety Department with this work status report after each and every visit to the medical provider. This form is to be completed by your HEALTH CARE PROVIDER and returned to UPS immediately following your appointment. Fax: 504-731-3717

'A.     (THIS SECTION TO BE COMPLETED BY EMPLOYEE ONLY)

| EMPLOYEE: *Winnie Evans* | Employee ID # | Telephone |
|---|---|---|
| MANAGER: | LOCATION: *UPS - New Orleans* | |

Date of injury/illness: _____

Last Day of Work *12, Feb.*

| B.     (FOR COMPLETION BY HEALTH CARE PROVIDER) | |
|---|---|
| Date: *8 / 28 / 06* | Diagnosis: *Hypertension reflux Insulin dependent diabetes* |

DATE OF NEXT FOLLOW-UP APPOINTMENT: ___/___/___

REFERRED TO:_____
Appointment Date:_____
Telephone:_____

DATE EXPECTED TO RETURN TO FULL DUTY: *8 / 29 / 06*

Work Status FROM ___/___/___ TO ___/___/___

___ PATIENT NOW TOTALLY DISABLED From Work

___ PATIENT ABLE TO WORK TEMPORARY ALTERNATE WORK OR MODIFIED DUTY WITH THE RESTRICTIONS INDICATED BELOW:

RECOMMEND WORK LIMITATIONS/RESTRICTIONS(Please check all appropriate boxes):

___ Lifting abilities: ____lb for __ hr/shift     ___No reaching above shoulder height

___ Pushing/pulling :___lb for __hr/shift     ___No reaching below waist

___ Carrying abilities: ___lbs for __hr/shift     ___Dry Work only

___ Bending/twisting/stooping: __hr/shift     ___No operating machinery/vehicles

___ No repetitive movement of_____     ___Other:_____

___ Standing/walking abilities: __hr/shift or __min/hr.     ___ Sitting abilities ___min/hr

COMMENTS: *Can work as a supervisor / manager preferably being active since he is insulin dependent diabetic, c reflux and Hypertension*

PHYSICIAN'S SIGNATURE: _____ DATE: *08-28-06*

PHYSICIAN NAME (PRINT): *YURIK IYRIBOZ, M.D.*

ADDRESS (CITY, STATE, ZIP): *5712 Goodwood, B.R. La. 70806*

TELEPHONE: *225-231-2020*     FAX #: *225-231-2169*

WHEN COMPLETED, PLEASE FAX TO: ( 504-731-3717)     Attention: Geraldine L Haydon RN, COHN
(District Occupational Health Manager
Telephone: 504-731-3781)



EXHIBIT
F

D0212



151 Brookhollow Esplanade
P.O. Box 23750
Harahan, LA 70123
504.734.6600 Tel

September 20, 2006

Rommel Griffin, Sr.
12480 Oak Alley Drive
Geismar, LA 70734

Dear Rommel:

On September 19, we received notification that you requested a job-related accommodation because of a self-reported physical or mental condition. In order to assess your request adequately, we need additional medical information regarding the way in which your reported condition impacts your ability to work at UPS.

Accordingly, enclosed are medical forms to be completed by your physician. Please provide them to your physician and mail the completed forms to:

Occupational Health Manager
151 Brookhollow Esplanade
Harahan, LA 70123
(504) 731-3781

Please note that your signature is called for on page three (3) of this form.

Because we cannot continue our assessment of your request until we have received the completed medical forms, it is to your benefit to return this information as quickly as possible, preferably within the next two weeks. If you fail to return the forms within four weeks of the date of this letter without authorization from the Occupational Health Supervisor, UPS will consider you to have withdrawn your request.

If you believe that you are completely unable to perform in your current position due to medical reasons now or at any time during our evaluation, please contact Geraldine Haydon for information concerning your eligibility for medical leave and benefits.

If you have questions relating to the above, please call me at (504) 734-6605. If our information is incorrect, and you are not seeking a job-related accommodation, please notify me immediately. I look forward to working with you to resolve this matter.

Sincerely,

Sherry A. Anderson
District Workforce Planning Manager

cc:    File

**EXHIBIT**
**G**
tabbies

D0057

ATL01/10402688 v1

*UNITED PARCEL SERVICE*

REQUEST FOR MEDICAL INFORMATION

Employee's Name:  ROMMEL GRIFFIN

**A.**   Instructions

The employee listed above has submitted a request for a job-related accommodation arising out of a medical condition. In order for UPS to assess the employee's request, please complete the following information and return it in the enclosed envelope to:

Occupational Health Manager – Confidential
151 Brookhollow Esplanade
Harahan, LA 70123
(504) 731-3781

If you have questions relating to this form or need clarification of the information requested, please call the Occupational Health Manager at the number listed above. If additional space is necessary, please feel free to attach additional sheets. UPS appreciates your cooperation and assistance.

**B.**   Requested Information

Attached to this form is a list of the essential functions of the employee's current position with UPS. After reviewing this list and evaluating the employee, please answer the following questions.

1.   Is the employee currently able to perform all of the physical and mental functions of his/her position?

     ✓ Yes     _____ No

2.   If the answer to Question 1 is "no," please identify the specific function(s) of the position that the employee is unable to perform?

     N/A

3.   In the chart provided below, please identify each and every physical or mental impairment that precludes or impairs the employee's ability to

ATL01/11040688 v1



EXHIBIT
H

D0172

perform the specific job function(s) identified in response to Question 2. For each impairment identified, please describe the nature of the job restriction(s), if any, resulting from the impairment and state the duration of those job restrictions.

| Impairment | Description of Job Restriction | Duration of Job Restriction |
|---|---|---|
| * SEE LETTER FROM BMC ATTACHED | | |
| | | |
| | | |

4.  For each impairment identified in response to Question 3, please state whether there are any medications or other corrective devices that would enable the employee to perform the functions of the position?

_____ Yes     __✓__ No          If the answer is "yes," please explain

_____

_____

_____

5.  Do any of the impairment(s) identified in Question 3 substantially limit the employee's ability to perform any major life activities other than working (e.g. caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, lifting, learning, etc.).

_____ Yes     __✓__ No

6.  If the answer to Question 5 is "yes," please identify the major life activity affected by the impairment, describe the manner in which the impairment substantially limits that major life activity and state whether medication or other corrective devices can reduce or eliminate that substantial limitation.

_____

2

D0173

_____

_____

_____

_____

_____

7.   In the space provided below, please identify any tests or other diagnostic
     methods that were used to determine this employee's abilities or the nature
     of his/her impairment, including the name of the diagnostic method and
     the date on which any such tests were administered to the employee.

_____

_____

_____

Name:      R. FRIDGE CAMERON, MD   Date: 11 - 4 - 06
           (Please Print)

Address:   175 HECTOR AVENUE
           GRETNA, LA 70056

Signature: _____   Telephone No. 504 - 349 - 6925

3

D0174



## Position:

**Non-Operations Specialists/Supervisors/Managers/unless otherwise listed**

## Essential Job Functions:

- Meet all of the applicable requirements as specified by the D.O.T.
- Work in a seated position during a portion of the day
    - Part-time: up to 5 ½ hours per day, 5 days per week
    - Full-time: 9-10 hours per day, 5 days per week
- Report to work on a regular and timely basis
- Ability to work varying shifts and additional hours depending on service needs
- Bend, lift/carry, stoop/squat, crouch/kneel, climb stairs and walk intermittently throughout the workday
- Perform office tasks using simple hand grasping, fine hand manipulation and reaching associated with assigned tasks such as paperwork, typing, and/or use of a computer, filing, calculating and use of telephone
- Must be able to supervise and train employees effectively
- Must be able to travel by car or plane to attend meetings at other locations (travel by car can be extensive as required by job and overnight stays may be required)
- Work in an environment with:
    - variable temperatures and humidity (climatic conditions)
    - outside inclement weather
    - exposure to dust, dirt and noise
    - enclosed work areas
- Have a sufficient ability to communicate, through sight, hearing, and/or otherwise, to perform assigned tasks and maintain proper job safety conditions
- Work with and manage other employees' time and activities.
- Work cooperatively in a diverse environment
- Demonstrate cognitive ability to:
    - follow directions and routines
    - work independently with appropriate judgment
    - exhibit spatial awareness
    - read words and numbers
    - concentrate, memorize, and recall
    - analyze and interpret data/reports
    - identify logical connections and determine sequence of response
    - processing up to 2-3 steps ahead
- Perform other functions that may be assigned

*The essential functions of this job may vary greatly depending upon the size and location of the UPS facility. At some locations, employees may not perform all of the essential job functions listed above. At other locations, employees may perform some or all of the functions listed above and, in addition, may be required to perform other jobs or tasks as directed. In addition, given the nature of the business, UPS retains the right to modify the essential functions of this position at any time.*

1/1/2008

**EXHIBIT**

tabbies®

**I**

D2188

# Tulane
UNIVERSITY
MEDICAL CENTER

4720 South I__ __ervice Road
Suit__ _01
Metairie, LA 70001

WEST BANK

**MEDICINE CLINIC**                    Phone: (504) 780-4485

THIS FORM PRINTED IN A SPECIAL GREEN INK

Name _ROMMEL - GRIFFIN_     Age ___

Address _____     Date _11/7/06_

Rx Patient would be in a
better position to follow his
therapeutic regimen for
diabetes, of working
morning hours

_Tk tk oths_     M.D

☐ Generic          ☐ Dispense as Written

DEA No. _____     LA No. _____

Refill:  0  1  2  3  4  5  6  or for _____ MONTHS

---

( _Dr Latha_ )

**Tilak K. Mallik, M.D., F.A.C.E., LLC**
Internal Medicine and Endocrinology

Tilak K. Mallik, M.D.     Vivian A. Fonseca, M.D.

1111 Medical Center Blvd., Suite S 113
Marrero, LA 70072

(504) 349-6520          Fax (504) 349-6522



**EXHIBIT**

**J**

D0211

Rommel E. Griffin, Sr.
12480 Oak Alley Drive
Geismar, Louisiana 70734
(504) 382-4351

November 13, 2006

Geraldine L. Haydon RN, COHN
Occupational Health Manager -- Confidential
151 Brookhollow Esplanade
Harahan, Louisiana 70123

Dear Geraldine:

I am returning the Request For Medical Information form to you with several attachments. After reviewing the form, it is evident that the information supplied by my medical providers validate that the information requested does not apply to my medical condition. Again I state that I am an insulin dependent diabetic and this medical condition, if not managed effectively, can result in disabilities to include but not limited to, blindness, loss of limbs, kidney and heart disease, to name a few. My diabetes is a condition that does not have to be a disability if I manage it properly, but to do so I will need UPS to make the accommodation to permit me to work days.

As you can see, in the attached documents from three independent medical providers each has recommended that daytime work would provide the optimum opportunity for me to effectively manage my medical condition.

Respectfully yours,

Rommel E. Griffin, Sr

Attachments:

Report from Dr. Fridge Cameron dated 06/21/2006 stating:

"Is ok to return to work on 6/22/2006 if ok with Behavioral Medicine --- he would be best severed if he worked Day hrs—as this would help him control his diabetes..."

Report from Dr. Yuruk Iyriboz (United Parcel Service's Company Doctor) dated 08/28/2006 stating:

"Can work as a supervisor/manager preferably during daytime since he is insulin dependent diabetic, & reflux and hypertension."

Report from Dr. Tina Tethi, (A Specialist in the field of Endocrinology) dated 11/7/2006 stating:

"Patient would be in a better position to follow his therapeutic regimen for diabetes, if working morning hours.



EXHIBIT
K
tabbies

P-27

## Activity Log

05 23?

Employee Name: _Romul Griffin_ ✓    Social Security Number _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_ /

Job Title: _Hub Manager._    Department / Operation: _NOLA Hub_

Employee Currently Working: Yes (No),    If No, Last Day Worked: _3/21/06._

| Activity | Person Responsible | Date | Initials |
|---|---|---|---|
| 1.  Request Received by:_____ Verbal or In Writing<br>         (Name)         (Please Circle One) | | | |
| 2.  Request File Opened    [One Week] | DWPM | 9/30/06 | |
| 3.  Acknowledgement Letter / Request for Medical Information Sent | DWPM | 9/30/06 | |
| 4.  Request File Forwarded to OHS | DWPM | | |
| 5.  Employee Medical Information Received and Date Stamped | OHS | 10/20/06 | MR |
| A. ___✓___ If no response in two weeks -- Reminder Letter Sent | OHS | | |
| B. _____ If no response in four weeks – Termination of Process Letter Sent | OHS | | |
| C. _____ If Information Insufficient -- Additional Information / Process Requested | OHS | | |
| D. _____ Additional Information / IME Results Received | OHS | | |
| 6.  Request File Forwarded to RWPM and OHM | OHS | 11/14/06 | MR |
| 7.  Evaluation of Employee's Condition Concluded | RWPM & ROHM | | |
| A. __X__ Not a Covered Disability | | 11/16/06 | J.J. |
| B. _____ Insufficient Medical Information    [Two Weeks] | | | |
| C. _____ May be Eligible for a Reasonable Accommodation | | | |
| 8.  Request File Returned to DWPM / OHS with Decision | WPM & ROHM | 11/16/06 | J.J. |
| 9.  Employee Notified of Results of Evaluation | DWPM | | |
| A. _____ Denial Letter Sent -- No Covered Disability / File Closed | | | |
| B. _____ Insufficient Medical Information Letter Sent    [Three Business Days] | | | |
| C. _____ Request for Checklist Meeting Letter Sent | | | |
|         Meeting Scheduled on _____ | | | |
| 10.  Checklist Meeting Held    [Two Weeks] | DWPM, OHS & DLRM | | |
| 11.  Completed Checklist Forwarded to Region ADA Committee    [One Week] | DWPM | | |
| 12.  Committee Conference Held | Committee | | |
| A. _____ Employee is a Qualified Individual with a Disability | | | |
|         Describe Identified Reasonable Accommodation:    [Two Weeks] | | | |
|         _____ | | | |
| B. _____ Employee is NOT a Qualified Individual with a Disability | | | |

61



D3288



| Activity | Person Responsible | Date | Initials |
|---|---|---|---|
| 13. Business Agent Requested to Attend Bargaining Session | DLRM | | |
| 14. Bargaining Session Held (union employees)<br>A. _____ BA Accepts Proposed Accommodation/Agreement Prepared<br>B. _____ BA Rejects Proposed Accommodation    [Two Weeks] | RWPM, DLRM, DWPM<br>DLRM | | |
| 15. Employee Informed of Decision<br>A. _____ If No Accommodation Available – Letter Sent   (Immediately)<br>B. _____ Of Accommodation Offered – Accommodation Meeting Letter Sent<br>     Meeting Scheduled on _____ | DWPM<br><br>DWPM | | |
| 16. Accommodation Meeting Held<br>A. _____ Employee Rejects Accommodation / Agreement Prepared<br>B. _____ Employee Rejects Accommodation / Report to Duty Letter Sent    [Two Weeks] | DLRM<br>DWPM | | |
| 17. Employee Response to Accommodation Agreement<br>A. _____ Employee Reports to Duty in New or Modified Position<br>B. _____ Employee Fails to Report | DWPM | | |
| 18. File Closed | DWPM | | |

COMMENTS:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

D3289

Rommel E. Griffin, Sr.
12480 Oak Alley Drive
Geismar, Louisiana 70734
(504) 382-4351

November 13, 2006

Geraldine L. Haydon RN, COHN
Occupational Health Manager — Confidential
151 Brookhollow Esplanade
Harahan, Louisiana 70123

Dear Geraldine:

I am returning the Request For Medical Information form to you with several attachments. After reviewing the form, it is evident that the information supplied by my medical providers validate that the information requested does not apply to my medical condition. Again I state that I am an insulin dependent diabetic and this medical condition, if not managed effectively, can result in disabilities to include but not limited to, blindness, loss of limbs, kidney and heart disease, to name a few. My diabetes is a condition that does not have to be a disability if I manage it properly, but to do so I will need UPS to make the accommodation to permit me to work days.

As you can see, in the attached documents from three independent medical providers each has recommended that daytime work would provide the optimum opportunity for me to effectively manage my medical condition.

Respectfully yours,

Rommel E. Griffin, Sr

Attachments:

Report from Dr. Fridge Cameron dated 06/21/2006 stating:

"Is ok to return to work on 6/22/2006 if ok with Behavioral Medicine---- he would be best severed if he worked Day hrs---as this would help him control his diabetes..."

Report from Dr. Yuruk Iyriboz (United Parcel Service's Company Doctor) dated 08/28/2006 stating:

"Can work as a supervisor/manager preferably during daytime since he is insulin dependent diabetic, & reflux and hypertension."

Report from Dr. Tina Tethi, (A Specialist in the field of Endocrinology) dated 11/7/2006 stating:

"Patient would be in a better position to follow his therapeutic regimen for diabetes, if working morning hours.

*UNITED PARCEL SERVICE*

REQUEST FOR MEDICAL INFORMATION

Employee's Name: _ROMMEL GRIFFIN_

A.   Instructions

The employee listed above has submitted a request for a job-related accommodation arising out of a medical condition. In order for UPS to assess the employee's request, please complete the following information and return it in the enclosed envelope to:

Occupational Health Manager – Confidential
151 Brookhollow Esplanade
Harahan, LA 70123
(504) 731-3781

If you have questions relating to this form or need clarification of the information requested, please call the Occupational Health Manager at the number listed above. If additional space is necessary, please feel free to attach additional sheets. UPS appreciates your cooperation and assistance.

B.   Requested Information

Attached to this form is a list of the essential functions of the employee's current position with UPS. After reviewing this list and evaluating the employee, please answer the following questions.

1.   Is the employee currently able to perform all of the physical and mental functions of his/her position?

_✓_ Yes   _____ No

2.   If the answer to Question 1 is "no," please identify the specific function(s) of the position that the employee is unable to perform?

_____N/A_____

3.   In the chart provided below, please identify each and every physical or mental impairment that precludes or impairs the employee's ability to

D3291

perform the specific job function(s) identified in response to Question 2. For each impairment identified, please describe the nature of the job restriction(s), if any, resulting from the impairment and state the duration of those job restrictions.

| Impairment | Description of Job Restriction | Duration of Job Restriction |
|---|---|---|
| ✳ SEE LETTER FROM BMC ATTACHED | | |
| | | |
| | | |

4.  For each impairment identified in response to Question 3, please state whether there are any medications or other corrective devices that would enable the employee to perform the functions of the position?

   _____ Yes     ✓ No       If the answer is "yes," please explain

_____

_____

_____

5.  Do any of the impairment(s) identified in Question 3 substantially limit the employee's ability to perform any major life activities other than working (e.g. caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, lifting, learning, etc.).

   _____ Yes     ✓ No

6.  If the answer to Question 5 is "yes," please identify the major life activity affected by the impairment, describe the manner in which the impairment substantially limits that major life activity and state whether medication or other corrective devices can reduce or eliminate that substantial limitation.

_____

2

D3292

_____
_____
_____
_____
_____

7.    In the space provided below, please identify any tests or other diagnostic methods that were used to determine this employee's abilities or the nature of his/her impairment, including the name of the diagnostic method and the date on which any such tests were administered to the employee.

_____
_____
_____

Name:    R. FRIDGE CAMERON, MD   Date: 11 - 6 - 06
(Please Print)

Address:    175 HECTOR AVENUE
GRETNA, LA 70056

Signature:    _____ MD  Telephone No. 504 - 349 - 6425

3

D3293



**West Jefferson**
**Medical Center**

*Behavioral Medicine Center - Bellemeade*
229 Bellemeade Boulevard
Gretna, Louisiana 70056

(504) 391-2440

6/21/06

To Whom It May Concern:

It is the recommendation of the treatment team here at the Behavioral
Medicine Center that Mr. Rommel Griffin be acclimated back in to work on
a less than full-time schedule. It is recommended he be allowed to work
four hours per day the first week, then six hours per day the second week.
He could then work full-time on his third week.

If you have any questions, please feel free to contact me at (504) 391-2440.

Thank you,

Christine Meche, LCSW
Adult Services Program Manager

reviewed 10/16/06

D3294

## Heart:
The heart reveals a regular rate and rhythm with a normal S1 and S2. There are no murmurs or gallops appreciated.

## Abdomen:
The abdomen is soft and non-tender. There is no guarding or rebound tenderness present. The bowel sounds are present. There is no hepatosplenomegaly, masses, or evidence of ascites. There is no costovertebral angle tenderness.

## Musculoskeletal:
There are no acutely inflamed or swollen joints. There are no obvious physical deformities. There is no edema present.

## ASSESSMENT:

| Diagnosis | Icd9 Code | Description |
|-----------|-----------|-------------|
| 25000 | 250.00 | Niddm Adult Controlled |
| 4011 | 401.1 | Benign Hypertension |
| 6929 | 692.9 | Dermatitis Nos |

Patient:    ROMMEL E GRIFFIN                          Date:         06/20/2006

## PLAN:
### Medication:

| Date Last Renewed | Brand Name | Dose | Rx Quanity | Rx Refills | Sig Desc |
|-------------------|------------|------|------------|------------|----------|
| 02/04/2002 | Zocor | 20mg | 30 | 3 | Take one tablet every night at bedtime. |
| 07/26/2005 | Monopril | 40mg | 30 | 3 | 1 q am |
| 02/16/2006 | Aciphex | 20mg | 30 | 3 | Take one tablet daily. |
| 12/29/2005 | Pv Tussin | | 8oz | 1 | Take one to two teaspoon every four hours as needed or cough. |
| 11/03/2005 | Starlix | 120 Mg | 100 | 3 | Take one tablet before meals three times per day. |
| 06/20/2006 | Lantus | 100 U/ml | 100 | 2 | take 58 units SQ q am. |
| 07/26/2005 | Metformin Hcl | 1000mg | 180 | 3 | 1 bid |
| | Insulin Syringe | | | 100 | 3        use as directed |
| 02/16/2006 | Penlac | 8% | 1 | 3 | Apply thin layer once daily |
| | Lotrisone | 1-0.05% | 15G | 3 | apply tid |
| 11/21/2001 | Aspirin | 325mg | 0 | 0 | Take one tablet daily. |

R F. Cameron has reviewed the medication.
The following lab(s) were ordered:
Chemistry
Glucose Quant. Blood
Urine Microalbium
Lab Tech Comments: quest-la
Hematology
Hemoglobin AIC

Plan notes: is ok to return to work on 6/22/06 if ok with Behavioral Medicine---he would be best severed if he worked Day hrs--as this would help him control his diabetes; he will need to continue the individual therapy sessions
Follow up: 3month(s)
Follow up: additional problems

ROMMEL E GRIFFIN                          3                          92446-15

D3295

# UNITED PARCEL SERVICE
## Worker's Compensation WORK STATUS REPORT

**TO THE EMPLOYEE:** Any employee with a work-related injury is responsible for providing Health and Safety Department with this work status report after each and every visit to the medical provider. This form is to be completed by your HEALTH CARE PROVIDER and returned to UPS immediately following your appointment. Fax: 504-731-3717



**'A.**      (THIS SECTION TO BE COMPLETED BY EMPLOYEE ONLY)



| EMPLOYEE: | (Employee ID # | Telephone |
| MANAGER: | LOCATION: | |

Date of Injury/Illness _____

Last Day of Work _____

**B.**      (FOR COMPLETION BY HEALTH CARE PROVIDER)

Date: _8 / 2-8 / 0 6_      Diagnosis: _Hypertension reflex insulin depen diabetes_

DATE OF NEXT FOLLOW-UP APPOINTMENT: ___/___/___

REFERRED TO: _____
Appointment Date: _____
Telephone: _____

DATE EXPECTED TO RETURN TO FULL DUTY _8 / 29 / 0 6_

Work Status  FROM ___/___/___  TO ___/___/___

___PATIENT NOW TOTALLY DISABLED From WORK

___PATIENT ABLE TO WORK TEMPORARY ALTERNATE WORK OR MODIFIED DUTY WITH THE RESTRICTIONS INDICATED BELOW:

RECOMMEND WORK LIMITATIONS/RESTRICTIONS(Please check all appropriate boxes):

___ Lifting abilities: ___lb for ___ hr/shift          ___No reaching above shoulder height

___ Pushing/pulling : ___lb for ___hr/shift           ___No reaching below waist

___ Carrying abilities: ___lbs for ___hr/shift        ___Dry Work only

___ Bending/twisting/stooping: ___hr/shift           ___No operating machinery/vehicles

___ No repetitive movement of _____      ___Other: _____

___ Standing/walking abilities: ___hr/ shift  or ___min/hr.       ___ Sitting abilities ___min/hr

COMMENTS·

_Can work as a supervisor / manager prefeebly during daytime since he is insulin dependent diabetic, c reflex and Hypertens_

| PHYSICIAN'S SIGNATURE: | DATE: _08·28·06_ |
| PHYSICIAN NAME (PRINT): YURUK IYRIBOZ, M.D. | |
| ADDRESS (CITY, STATE, ZIP): _5712 Good wood, B.R. La. 70806_ | |
| TELEPHONE _(225)231·7070_ | FAX # _225·231·7169_ |

WHEN COMPLETED, PLEASE FAX TO: ( 504-731-3717))      Attention:  Geraldine L Haydon RN, COHN
(District Occupational Health Manager
Telephone:  504-731-3781)

D3296



Tulane
UNIVERSITY
MEDICAL CENTER

4720 South I-10 Service Road
Suite 401
Metairie, LA 70901

WEST BANK

MEDICINE CLINIC                        Phone: (504) 780-4485

Name ROMMEL ~ GRIFFIN          Age _____

Address _____          Date 11/7/06

℞ Patient would be in a better position to follow his therapeutic regimen for diabetes, if working morning hours

_____ M.D

☐ Generic            ☐ Dispense as Written.

DEA No. _____ LA No. _____

Refill: 0  1  2  3  4  5  6 or for _____ MONTHS

_____
Tilak K. Mallik, M.D., F.A.C.E., LLC
Internal Medicine and Endocrinology

Tilak K. Mallik, M.D.      Vivian A. Fonseca, M.D.

1111 Medical Center Blvd., Suite S 113
Marrero, LA 70072

(504) 349-6520                    Fax (504) 349-6522

D3297

October 26, 2006

Romell Griffin ᔕ ᵧ.
12480 Oak AlleyDrive
Geismar, LA 70734

Dear Romell:

On September 20, 2006, UPS sent you a letter acknowledging your recent request for a job-related accommodation and enclosing medical forms to be completed by your physician. Since that time, however, we have not received any communication from your physician. As you are aware, we cannot continue our assessment of your request until we receive the completed medical forms.

If you are having difficulty securing the requested medical information or need other assistance with this process, please call me at 504-731-3781. Otherwise, if we do not receive your completed forms by November 9, 2006, UPS will consider you to have withdrawn your request and discontinue processing the request at that time.

Sincerely,

Geraldine L Haydon  RN, COHN
Occupational Health Manager

cc:    File

*Denied*

ATL01/10402688 v1

D3298



151 Brookhollow Esplanade
P.O. Box 23750
Harahan, LA 70123
504.734.6600 Tel

September 20, 2006

Rommel Griffin, Sr.
12480 Oak Alley Drive
Geismar, LA 70734

Dear Rommel:

On September 19, we received notification that you requested a job-related accommodation because of a self-reported physical or mental condition. In order to assess your request adequately, we need additional medical information regarding the way in which your reported condition impacts your ability to work at UPS.

Accordingly, enclosed are medical forms to be completed by your physician. Please provide them to your physician and mail the completed forms to:

Occupational Health Manager
151 Brookhollow Esplanade
Harahan, LA 70123
(504) 731-3781

Please note that your signature is called for on page three (3) of this form.

Because we cannot continue our assessment of your request until we have received the completed medical forms, it is to your benefit to return this information as quickly as possible, preferably within the next two weeks. If you fail to return the forms within four weeks of the date of this letter without authorization from the Occupational Health Supervisor, UPS will consider you to have withdrawn your request.

If you believe that you are completely unable to perform in your current position due to medical reasons now or at any time during our evaluation, please contact Geraldine Haydon for information concerning your eligibility for medical leave and benefits.

If you have questions relating to the above, please call me at (504) 734-6605. If our information is incorrect, and you are not seeking a job-related accommodation, please notify me immediately. I look forward to working with you to resolve this matter.

Sincerely,

Sherry A. Anderson
District Workforce Planning Manager

cc:     File

ATL01/10402688 v1

D3299



151 Brookhollow Esplanade
P.O. Box 23750
Harahan, LA 70123
504.734.6600 Tel

November 16, 2006

Romell Griffin
12480 Oak Alley Drive
Geismar, LA 70734

Dear Romell:

Over the last several weeks, UPS has carefully evaluated your request for a job-related

accommodation concerning your self-reported physical or mental condition.  We are

writing to inform you that (*based upon the medical information that we have*

*received*/because of a lack of relevant information from your doctor), we are unable to

conclude that you are eligible for a reasonable accommodation pursuant to the Americans

with Disabilities Act.

If you have questions concerning your entitlement to benefits or your employment status

at this time, please call me at 504-734-6605.

Sincerely,

Sherry A. Anderson
District Workforce Planning Manager

cc:  Geraldine Haydon
     Occupational Health Manager
     File

ATL01/10402688.v1



EXHIBIT

M

R-89

Rommel E. Griffin, Sr.
12480 Oak Alley Drive
Geismar, Louisiana 70734
(504) 382-4351


December 1, 2006


Sherry A. Anderson
District Workforce Planning Manager – Confidential
151 Brookhollow Esplanade
Harahan, Louisiana 70123

Dear Sherry:

I was and still am very disappointed with the letter that I received from UPS dated November 16, 2006. Furthermore the letter requested that I contact you at 504-734-6605 relative to my entitlement to benefits and employment status.

I talked briefly with you on Monday November 27, 2006 and you stated that you had not seen the letter date November 16, 2006 but you would research and get back with me. As I compose this letter I have not heard from you. In addition I've made numerous calls to you and left messages since Monday only to receive no response.

I reported to UPS on June 22, 2006 after a covered leave of absence, highly motivated and driven with a desire to return to work. Due to a medical condition I made a request for daytime work to help me manage my medical condition. My request was supported by recommendations from three medical providers, one being a medical doctor representing UPS.

At the time of my return, there was a job available in the Human Resources Group held by Gerald Barnes who had been granted relocation accommodations to Atlanta, Ga. My twenty plus years of working in investigations, claims, internal and external customer service issues and my people skills made me a qualified candidate for this position, but I was denied that opportunity also.

UPS made no reasonable attempt to comply with my request but instead presented a series of delays and continue even now to deny me an opportunity to return to work and continue my employment.

Based upon the letter received on November 16th and having had my income suspended for the past months, I am regretfully submitting to UPS' strategy to force me into retirement. I am requesting that you contact me with the status of any and all benefits, vacation pay for calendar year 2006, MIP Award, etc. that I am entitled to.


Respectfully yours

Rommel E. Griffin, Sr

cc: Roman Williams, District Human Resource Manager
cc: Geraldine Hayden, District Occupational Manager



EXHIBIT
N

D0171