UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROMMEL E. GRIFFIN, SR. | CIVIL ACTION NO. 2:08-cv-2000 |
| VERSUS | JUDGE CARL L. BARBIER |
| UNITED PARCEL SERVICE, INC. | MAGISTRATE ALMA L. CHASEZ |

*******************************************************************************

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

Plaintiff and Defendant filed their cross motions for summary judgment on May 19, 2010. Pursuant to the Court's order that the parties submit reply briefs, if any, within five working days from the date of the filing of the motions, Plaintiff Rommel E. Griffin, Sr. submits his memorandum in opposition to the motion for partial summary judgment filed on behalf of UPS.

### Response to UPS' Summary of "Relevant Facts"

UPS describes what it contends are the "relevant facts" for disposition of this case at pages 1-4 of its Memorandum. Although Plaintiff and UPS are in agreement as to many of the facts, including background facts and those more directly relevant to a resolution of this case, Plaintiff takes issues with some of the statements and inferences contained in the UPS factual summary.

For example, although it is accurate that Alan Rundle of UPS informed Plaintiff that

-1-

he was being assigned to the Midnight Hub Manager position, UPS inaccurately implies that this occurred <u>prior</u> to Plaintiff inquiring about a lateral move to the Employee Relations Manager position, and <u>prior</u> to Plaintiff being told that the GulfSouth District was seeking funding for a Hub training manager position that Plaintiff could fill. In fact, Plaintiff was not offered or assigned to any position whatsoever until approximately August 21 or 22, 2006, two months after he was released to work and after numerous attempts on Plaintiff's part to be reassigned.[1]

UPS claims in its Memorandum that "**[c]ritically,** ...[Plaintiff] did not request an accommodation from UPS (that he not be required to work nighttime hours due to his diabetes) until after August 24, 2006." (P. 3). Plaintiff does not agree that the timing of his request under the facts of this case is critical or even relevant. All that matters is that he made the request for accommodation after he was assigned to the Midnight Hub Manager position. However, in response to UPS' misstatement of the order of events and the apparent belief of UPS that the order of events and the timing of the request are critical to the outcome of this case, Plaintiff asserts that he made his request for an accommodation immediately upon learning that he was being assigned to the overnight position.[2]

Plaintiff further objects to UPS' implication in its summary of relevant facts that its reliance on the "Request for Medical Information" provided to Plaintiff's physician, Dr. Cameron, was reasonable. This is far from the case. The form and substance of the "Request for Medical Information" was created by UPS– not by Congress, and not by a

---

[1] *See* Plaintiff's Afffidavit, Exh. "A" to Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment, and attached again herein as Exh. "A", at paragraphs 30-34.

[2] Exh. "A", at paragraph 34-36.

court. There is nothing sacrosanct about this document, and in fact the document is woefully inadequate and misleading if the intent of the document was (as it should have been) to genuinely determine whether Plaintiff, as a result of his diabetes, was substantially limited in the life activity of eating, and whether he should be granted the accommodation of not being required to work nights in order to better manage the timing, content and consistency of his meals.

The Request for Medical Information does not mention "eating" as a major life activity. Further, it fails to inform Plaintiff's doctor that the title of the position is "Midnight Hub Manager" or that the regular hours of the position were from 10 or 11 p.m. until 6-7 a.m. Even Plaintiff recognized the deficiencies in this document, and pointed them out in letter of November 13, 2006, in which he returns the completed Request for Medical Information, and states, inter alia, that **"[a]fter reviewing the form, it is evident that the information supplied by my medical providers validate that the information requested does not apply to my medical condition."**[3] He again referenced in his letter the three physician statements, and attached them. Thelma Lee admitted in her deposition that this letter was part of the package she reviewed prior to making the recommendation to deny his request.[4] The letter was completely ignored.

Dr. Cameron's lack of understanding of the hours that Plaintiff was being requested to work at the time he completed the Request for Medical Information is illustrated by his

---

[3] *See* November 13, 2006 letter, attached to Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment, as Exhibit "K", and attached hereto as Exhibit "B".

[4] See Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment, discussion at p. 12 and Exhibits "L" and "J" to that Memorandum.

unequivocal and lengthy responses when specifically questioned at his deposition, by UPS' attorney, concerning the potential effect on Plaintiff's ability to manage his diabetes if he was required to work through the night.  He thoroughly explained that Plaintiff, as a diabetic, "should try to be on the same time schedule, you know, eat breakfast the same time every morning, eat lunch the same time, have dinner the same time, try to go bed roughly at the same time, keep everything in a routine and orderly fashion as much as they can."[5]  He further testified that it had been his "experience that patients [with diabetes] who rotate around and change hours don't do as well as those that have fixed hours."[6]  Further, the fact that a diabetic patient has "fixed night hours" for work does not resolve the problem:

> If he continued working only at night and never had to go back and shift and go back and work, ...it would be my opinion that at some point in time he's going to have days off and he's going to be at home and his family's going to be aware during the daytime and he's going to want to be awake during the daytime, and the days that he's off and not working, his schedule will be different.  Then when he goes back and works nights again, he has to get back on his night schedule and his diabetic management would not be as good.[7]

Had UPS chosen to meet or talk with Mr. Griffin or his physicians, or had UPS even bothered to review his medical records, UPS would have had been able to acquire the information it needed to make a fully informed decision.  Instead, and wilfully so, UPS relied solely on the Request for Medical Information, thereby ignoring the wealth of information it might have gathered.  The fact that UPS did not even speak to the very

---

[5] Deposition of Dr. Cameron, at p. 9, lines 21-25.

[6] *Id.* At p. 27, lines 23-25.

[7] *Id.* At p. 28, lines 13-25.

physician that UPS selected to examine Mr. Griffin dramatically demonstrates that UPS' approach to evaluating a request for accommodation is to search out support for denial, and to avoid any information that might lend support to a finding that an accommodation is in order.

### UPS' Narrow Interpretation of "Disability" Under the Facts of this Case Is Inconsistent with the Language of the Statute and with Congressional Intent

UPS argues that unless Plaintiff demonstrates that he "is incapable of eating or properly digesting food" (p. 8 of UPS' Memorandum),he cannot prove that his diabetes substantially limits the major life activity of eating. This statement in and of itself demonstrates UPS' failure to understand the intended scope and purpose of the Americans with Disabilities Act.[8]

"The ADA was the culmination of the disability rights movements effort to effectuate civil rights protection for Americans with Disabilities. It is important to keep in mind that lawmakers made clear that the ADA was norm-changing legislation, akin to the legislative turning points in this country's struggle to overcome racial discrimination. President Bush referred to the Act as a 'historic new civil rights Act.' Senator Tom Harkin, the champion of the Act, announced it to be the '20th century Emancipation Proclamation for all persons with disabilities,' while Senator Dole called it 'the most comprehensive civil rights legislation our Nation has ever seen. Unlike other legislation designed to settle narrow issues of law, the ADA has a comprehensive reach and should be interpreted with this goal in mind."

---

[8]In fact, UPS goes so far as to make the offensive and nonsensical argument that Plaintiff's "capability of eating and digesting his food is reflected by his various weights". UPS goes on to record that at one time Plaintiff's weight was 274 pounds, and that he is currently 253 pounds. *See* fn. 15 to Defendant's Memorandum..

*Anderson v. Gus Mayer Boston Store of Delaware*, 924 F.Supp. 763 (E.D. Tex. 1996), at 771, (internal citations to Congressional records omitted.)

Further, "[a]s a remedial statute [the ADA] must be broadly construed to effectuate its purposes." *Kinney v. Yerusalim*, 812 F.Supp. 547 (E.D.Penn. 1993), aff'd, 9 F.3d 1047, cert. denied, 511 U.S. 1033, 114 S.Ct. 1545. "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *PGA Tour, Inc. v. Martin*, 121 S.Ct. 1879 (2001), citation omitted.

UPS claims that "Plaintiff's personal physicians never testified that Plaintiff's ability to eat would be substantially limited if he worked nights." (P. 6). UPS, however, was present at Dr. Cameron's deposition, discussed above, and Dr. Cameron's testimony clearly demonstrates that working through the night will pose a serious threat to Plaintiff's ability to manage his diabetes because of the difficulties of eating in accordance with Dr. Cameron's recommended eating schedule. To argue that the necessity of consistently following the described eating schedule is not a "substantial limitation" on the major life activity of eating is to wilfully ignore the purpose, scope and breadth of the ADA.

Another example of Defendant's overly narrow interpretation of the ADA is its continued argument that without a doctor's "mandate" or "requirement", an individual is not entitled to a requested accommodation. A review of the jurisprudence reflects that more often than not, a plaintiff's physician simply made a "recommendation", just as occurred here. For example, in *Cooper v. United Parcel Service, Inc.*, 2008 WL 4809153 (E.D. La. 11/3/08), Unites States District Court Judge Martin Feldman denied a motion to dismiss brought by UPS in a case where a plaintiff alleged that he had post-traumatic stress

disorder and his "doctors **recommended** that he avoid high heat and high stress situations." He claimed that his requests for accommodation were denied, and there as here, UPS did not allow him to return to work. The Court held that the plaintiff adequately pled a claim based on the allegations of disability, the impact on his life, **"and his doctors' recommended accommodations"**. Similarly, in United States of America v. Mississippi Department of Public Safety, 309 F.Supp. 837 (S.D. Miss. 1/26/04)., the Court denied the employer's motion for summary judgment, where the plaintiff, an insulin-dependent diabetic, asked for the reasonable accommodation of being allowed to eat more at meals than other police trainees. And see Office of the Architect of the Capitol v. Office of Compliance, 361 F.3d 633, 636 (Fed.Cir. 2004), in which the Plaintiff requested an accommodation "consistent with her doctor's **recommendation**."

### UPS Did Not Engage In The "Interactive" Process Required by the ADA

On June 5, 2009, the United States Fifth Circuit reversed summary judgment rendered by a Texas district court in favor of the employer, holding that a genuine issue of material fact existed as to whether an employee's chronic fatigue syndrome caused a substantial limitation on certain major life activities. EEOC v.. Chevron Phillips Chemical Co., LP, 570 F.3d 606 (5th Cir. 2009). Although the case did not involve diabetes, the case is significant here for its discussion of the requirement that once an employer makes a request for an accommodation, **"the employer is obligated by law to engage in an 'interactive process': a meaningful dialogue with the employee to find the best means of accommodating that disability....The process thus requires**

**'communication and good-faith exploration....[citations omitted] When an employer does not engage in a good faith interactive process, that employer violates the ADA- including when the employer discharges the employee instead of considering the requested accommodations."** *Id.* at 621. Plaintiff submits that this rationale is equally applicable where the employee is not discharged, but is denied a requested accommodation without a "meaningful dialogue with the employee" or any interactive process whatsoever.

### UPS Has Not Offered Any Evidence That Contradicts The Fact That Plaintiff's Diabetes Is Not and Has Never Been Controlled

UPS is correct that the issue is how diabetes affects *this* plaintiff in *this* case. However, it is UPS itself, not Plaintiff, who has failed to provided any individualized analysis of Plaintiff's condition. Plaintiff has attested in his affidavit that he was unable to manage his diabetes with medication, diet and exercise alone, and that by 2004 he was required to add injectable insulin to his regimen, and that in November, 2006, the same month that he was denied an accommodation, his insulin dosage as increased. Further, even with the insulin and careful management of his diet and exercise, he has *never* attained the blood sugar test goals set by his physicians.[9] This affidavit testimony is supported by the testimony of both Dr. Cameron and Dr. Thethi.[10] Further, Dr. Cameron has testified that hypertension, which is one of Plaintiff's other medical conditions, "makes it even more

---

[9] *See* Exhibit "A".

[10] See, e.g. Dr. Thethi's testiomny summary at pp. 20-21 of Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment.

important that the glucose levels be maintained as closely as possible."[11] Dr. Thethi has testified that disturbed sleep patterns can cause blood sugars to elevate, and that counter regulatory hormones that elevate blood glucose are released at different times when diabetics work at night.[12]

Significantly, UPS has not submitted any affidavit or any deposition testimony of a single lay person, physician or expert witness that refutes the above summary of Plaintiff's medical condition. The only testimony UPS attempts to rely on to undermine the severity of Plaintiff's condition is the testimony of his own wife, which attempt falls flat. Mrs. Griffin's testimony that her husband's "lifestyle" is not limited by his diabetes does not reach the issue before this Court, nor does her testimony that he is "not on a specific diet."

### UPS Raises Issues That Are Not Before The Court

UPS addresses multiple issues that are not before the Court, such as whether Plaintiff has a record of disability); whether Defendant was "regarded" as disabled because of his diabetes; and whether Plaintiff is limited in his ability to work. Plaintiff has not raised any of these issues in his lawsuit or in his motion for partial summary judgment.

### Plaintiff Can Perform the Essential Functions of an Operations Manager

The fact that the generic job description of "Operations Manager" requires variable shifts and extended hours as business needs dictate does not mean that Plaintiff cannot perform the essential functions of an Operations Manager. He is able to do all of the substantive duties and responsibilities of the work, including extended hours and variable

---

[11] Deposition of Dr. Cameron, at p. 68, lines 9-12.

[12] Deposition of Dr. Thethi, at p. 84, lines 7-16.

shifts; all that he cannot do is the regular overnight work required of the midnight shift. An "employer's duty to reasonably accommodate a disabled employee includes job restructuring, reassignment of the employee to a vacant position for which she is qualified, and other similar accommodations. See 42 U.S.C. § 12111(9)(B)." *Office of the Architect of the Capitol v. Office of Compliance*, 361 F.3d 633, 639 (Fed.Cir. 2004).

This is not a question of an employer with a relatively small and inflexible work staff. This is UPS. Daniel Torian, the UPS Human Resources Manager for the GulfSouth District testified that when a person comes back from leave, regardless of whether it is a military leave, worker's compensation leave, or disability leave, if there's no immediate available position, UPS "put[s] them back until there is an available position...."[13] UPS did not refuse to grant Plaintiff his requested accommodation because there was no other work option for him; UPS refused to grant Plaintiff his requested accommodation because it reached the conclusion, albeit erroneously, that he was not "disabled".

## Conclusion

Plaintiff, Rommel E. Griffin, Sr., has diabetes. His diabetes substantially limits his major life activity of eating, for the reason that he must carefully manage when he eats, what he eats, and how much he eats. After twenty-eight years of employment, and after a stress-related disability leave, he was assigned for the first time in his career to a position that required overnight work. He requested the reasonable accommodation of not being required to work overnight, in order to manage his medical regimen, including his eating

---

[13]*See* Deposition of Daniel Torian, at p. 65. This fact, according to Mr. Torian, is why there are circumstances in which staffing can be over what is called for in the staffing plans at UPS. *Id., discussion at pp 56-65,* Exhibit "C".

regimen. UPS' refusal to grant him this accommodation violated the Americans With Disabilities Act, and its motion for partial summary judgment should be denied.

                Respectfully submitted,

/s/   Lisa Brener
Lisa Brener (#1809)
Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Tel. (504) 568-1990
lbrener@lawla.com

**Attorney for Plaintiff
Rommel E. Griffin, Sr.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of May, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Lisa Brener
Lisa Brener