## AFFIDAVIT

STATE OF LOUISIANA

PARISH OF ORLEANS

**BEFORE ME,** the undersigned Notary Public, duly commissioned and qualified in and for the aforesaid State and Parish, personally came and appeared **Rommel E. Griffin, Sr.**, who, after being duly sworn, did state as follows:

1.

That he is an African-American individual of the age of majority, 58 years old, born on June 18, 1951, and currently residing in Geismar, Louisiana.

2.

That all of the facts set forth herein are based upon Affiant's personal knowledge, information and belief.

3.

That he was employed by United Parcel Service ("UPS") for more than twenty-eight years, from 1978 until December, 2006, at which time he had no financial alternative other than to retire, for the reason that UPS failed and refused to return him to a position following a medical leave of absence.

4.

That he was diagnosed with Type 2 Diabetes in approximately 1998.

5.

That his mother and several of his ten siblings also have Type 2 Diabetes, and his father was diagnosed with diabetes in his seventies.

-1-



6.

That he was initially able to manage his diabetes with medication, diet and exercise, but by 2004, his diabetes was so uncontrolled that he was prescribed injectable insulin as part of his regimen, in addition to medication, diet and exercise.

7.

That in November, 2006, his insulin dosage was increased, as a result of high blood sugar tests of over 200 for several weeks.

8.

That he has continuously, to this date, followed a regimen for managing his diabetes that involves medication, insulin, exercise, checking his blood by finger prick several times daily, and the careful monitoring and management of his diet.

9.

That the injection of insulin and checking of his blood by finger prick requires sterile equipment and sanitary conditions.

10.

That he injects his insulin at bedtime, at approximately 10 or 11:00 p.m., for the reason that when he formerly injected his insulin in the morning, he did not have favorable results in managing his blood sugar.

11.

That he is constantly vigilant and must be constantly vigilant in determining when to eat, what to eat (balancing proteins and carbohydrates), and how much to eat, and that this requires, for him, consistent access to healthy food options and a consistent schedule which permits him to eat his meals and snacks within a particular range of time each day.

-2-

12.

That when he does occasionally eat too large a meal, skip a meal, or eat too many carbohydrates or not enough protein, he begins to perspire and his skin becomes balmy, and frequently his vision becomes blurry.

13.

That he has lost in excess of twenty pounds since November, 2006, and uses his best efforts to manage his diet and to exercise.

14.

That despite his best efforts, he has not attained the blood sugar test goals set by his physicians.  For example, on  the Ac1 test he has never had a reading of 7; his testing ranges from high 7s to high 9s.

15.

Further, that although his morning fasting test sometimes is as low as 105, it frequently is as high as 150 or higher.  His blood test last night, January 3, 2010, was 197, although he had followed his regimen of diet, medicine, and insulin.

16.

That when he feels stress, such as from employment, personal issues, or this litigation, he sees a correlation with his blood sugar readings, making it even more important to him as a personal goal to carefully manage his regimen, including his diet and medicine.

17.

That he suffers from hypertension and occasional reflux in addition to his diabetes.

18.

That he held the position of Twilight Hub Manager of the Morrison Road UPS facility from Spring, 2004, until he was replaced during the time that he was out on a medical leave of absence and short term disability in Spring, 2006.

19.

That prior to Hurricane Katrina, as Twilight Hub Manager he worked from approximately 2:00 in the afternoon until, typically, 10-11:00 at night, and occasionally as late as midnight.

20.

That prior to Hurricane Katrina, he had a staff of one full-time supervisor, approximately five part-time supervisors, and he managed a group of approximately one hundred part-time employees. His performance evaluation for the year ending December 31, 2004, was 93.2.

21.

That during the time he worked at the Morrison Road facility prior to Hurricane Katrina, as the Twilight Hub Manager, his wife, with whom he lived in Gentilly, frequently brought him an evening meal, and there were restaurants and stores open in New Orleans East where he could purchase food.

22.

That the home in which he lived with his wife in Gentilly, Louisiana, had more than six feet of flood water during Hurricane Katrina.

23.

That he was ordained as a minister in 1999, and became the pastor of a church in

-4-

2002; and the church was also flooded during Hurricane Katrina, and his congregation was scattered by evacuation and destruction of homes and business.

### 24.

That he returned to his employment from his evacuation in Houston shortly after Hurricane Katrina, and worked in Jackson, Ms and Port Allen, LA while the Morrison Road location, which had also flooded, was being restored.

### 25.

That he returned to his work as Twilight Hub Manager on Morrison Road when the facility re-opened.

### 26.

That upon returning to work on Morrison Road in the Fall, 2005, his wife, who was living in the Baton Rouge area, could not bring him meals, and there were no open stores or restaurants.

### 27.

Further, in the months following Hurricane Katrina, there was little time to eat at work, because the facility was understaffed, had lost long-time experienced employees, and was staffed with inexperienced and often incompetent new workers.

### 28.

By September into October, 2005, Affiant had begun experiencing numbness in his head and face, and pain in his arms and chest. After several visits with physicians and to the emergency room at the hospital, Affiant took a leave of absence in March, 2006, and applied for and received short-term disability benefits. Affiant's physician and Affiant

believed that the numbness and pain were stress-related.

29.

That he attended a counseling program at West Jefferson Behavior Medicine Clinic, which involved group therapy of approximately three hours a day, three times a week. He attended the program from April 4, 2006 until June 21, 2006, at which time he was discharged.

30.

That he reported back to UPS on June 22, 2006, and was looking forward to be assigned to work. However, he was told that the Twilight Hub Manager position was filled, and that another position for which he believed he was well-suited, Employee Relations Manager, was going to be filled with another individual.

31.

That Roman Williams, the GulfSouth District Human Resources Manager, told him that he was working on obtaining a new position for the district, of Hub Training Manager, which would be Affiant's position. That position had no operational responsibilities, solely training responsibilities, and the hours, as he understood it, were comparable to the position of Twilight Hub Manager, although sometimes going into the early hours of the midnight hub operation, i.e. midnight or 1:00 a.m.

32.

That although he felt that he would be in a better position to manage his diabetes if he could be home by evening, he was willing to accept either his Twilight Hub Manager position or the new Hub Training Manager position, for the reason that in either position, with careful planning, he could still eat his meals, take his medicine, inject his insulin, and

-6-

check his blood at the approximate same time each of the seven days of a week, including both working and non-working days.  The routine would not be significantly disrupted.

33.

That he checked in, by telephone and in person, on many occasions during July and August, wanting to be put back to work.

34.

That on or about August 21-22, 2006, he was told that the Hub Training Manager position had not been approved, and that he was to be assigned to the Midnight Hub Manager position, that would require that he work from 10 or 11 at night until 5:00 or 6:00 a.m., or on occasion as late as 7:00 a.m.  Affiant, in past positions, such as with the Security department, had personally observed Midnight Managers still at work at 7:00 in the morning.

35.

That under such a schedule, he did not believe that he could reasonably expect to be successful in the management of his diabetes, including his meals, medication and insulin, when he would be eating meals and taking his medicine at "normal" times on weekends, holidays and vacations, but at other times during the week when he was working all night and sleeping all day.

36.

That he requested the accommodation of not being required to work at nights as required by the Midnight Hub Manager position; he made this request in writing on August 24, 2006, and again by letter dated November 13, 2006, and provided three recommendations from physicians concerning this request, including the recommendation

of the UPS doctor to whom he was sent, Dr. Iyriboz.

37.

That through the course of his more than twenty-eight years of employment with UPS, Affiant asserts that it was not uncommon when managers went out on leaves of absence for medical or other reasons, that their positions were maintained for them. Sometimes substitutes were used for a period of time and sometimes experienced supervisors filled in during the absence.  In fact, on two occasions, Affiant himself temporarily assumed the responsibilities of managers out on medical leaves of absence.

38.

At the time that Affiant was transferred to the position of Twilight Hub Manager on Morrison Road in Spring, 2004, the position had been vacant for a substantial period of time, and two supervisors had been left in charge, while awaiting a new manager.

39.

One of these supervisors, Alex Greene, was experienced and knowledgeable, and was of great assistance to Affiant in his transition to his new position.  Greene was still employed as a supervisor beneath Affiant when Affiant went out on disability leave in March, 2006, and Greene could have easily assumed all of the responsibilities and duties of the Twilight Hub Manager position until Affiant's return.

40.

Affiant further asserts that over the course of his more than twenty-eight years of employment with UPS, the company has frequently moved managers from positions to positions, as demonstrated by his own employee history profile.

41.

-8-

That the individual who was given the position of Twilight Hub Manager could have been moved into the Midnight Hub Manager position, which would have permitted Affiant to return to his position.  Said individual, Darryl Cemo, had not worked as a manager before, having been a supervisor until his promotion into this position, and had far fewer years with UPS.  Further, he had no hub experience.

42.

That it has also been Affiant's experience that when individuals return from disability leave, they are immediately returned to work in some capacity until an appropriate permanent assignment can be made for them.

43.

That at the time Affiant requested the accommodation that he not be required to work at night, he had serious concerns that he would not be able to adequately and consistently follow the medical and dietary regimen required to manage his diabetes if he could not sleep at night for each of the seven nights of the week, and eat his meals and take his medicine and insulin and check his blood at the approximate same times of each day.

New Orleans, Louisiana, this 4th day of JANUARY, 2010.

Rommel E. Griffin, Sr.

Notary Public
Lisa Brener (1809)

-9-